**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Dennis G. DAVIS, Appellee.**

Superior Court of Pennsylvania.

Submitted Oct. 15, 2001.
Filed May 23, 2002.

---

Robert S. Bell, Asst. Dist. Atty., Indiana, for Com., appellant.

Michael C. Pribanic, Pittsburgh, for appellee.

Before TODD, J., CERCONE, P.J.E., and OLSZEWSKI, J.

CERCONE, P.J.E.

¶ 1 The Commonwealth appeals from the order of the Trial Court which granted the motion for judgment of acquittal of Appellee, Dennis G. Davis, and reversed his conviction on the charges of operating an illegal "bottle club" and selling beer at his place of business without a license, in contravention of 18 Pa.C.S.A. § 7328 and 47 P.S. § 4–492(2), respectively. After review, we affirm in part and reverse in part.

¶ 2 In March of 2000, Appellee was operating a business establishment known as Club X–Treme, which was located in the borough of Indiana, Indiana County. In order to open this establishment, Appellee had made extensive renovations to an abandoned building. N.T. Trial, 11/7/2000, at 25. Appellee originally operated his facility as an entertainment establishment serving people under twenty one (21) years of age; however attendance at the establishment declined precipitously after it became known in the community that one of Appellee's employees, unbeknownst to Appellee, was eavesdropping on customers who were college students and providing information to the police about the location of off campus drinking parties. Id. at 27. In an effort to revive his business and induce customers to return, Appellee decided to begin offering free beer. Id. at 29. Before doing so he consulted with enforcement officials from the Liquor Control Board on how to provide free beer to adult customers without violating any laws. Id. at 20, 29.

¶ 3 In an attempt to comply with recommendations given to him by an official of the Liquor Control Board, concerning the proper manner in which to give away free beer, Appellee made renovations to the physical layout of the club. N.T. Trial,

10/3/2000, at 36, 45. After the renovations were complete, the interior of the building was arranged in the following manner: At the building entrance was a ticket booth located to the immediate left of the entryway. *Id.* at 12, 40. To the right of the entryway was a ramp which led down to a large main room that housed a five thousand square foot lighted dance floor as well as an entertainment area containing pool tables and video games. *Id.* at 12, 16; N.T. Trial, 11/7/2000, at 30, 33. On the left hand side of the entryway, further below the ticket booth, was a set of steps leading down to a lounge area. *Id.* at 30. The lounge area was closed off from the dance floor. N.T. Trial, 10/3/2000, at 39.

¶ 4 Once the renovations were complete, in December of 1999, Appellee began offering free beer. N.T. Trial, 11/7/2000, at 34. The admittance policy of the club, as set by Appellee, was that a patron desiring free beer could enter the club without paying and go to the lounge area and consume the free beer which was stored in that area. *Id.* at 33. However, if an individual wished to obtain access to the entertainment area of the club then he or she was required to pay a six (6) dollar fee. *Id.* Individuals not paying the fee were not permitted to enter the entertainment area. Individuals paying the fee were permitted access to both the entertainment and lounge areas.

¶ 5 On the night of March 17, 2000, Officer Thomas K. Weaver, a member of the Pennsylvania State Police Bureau of Liquor Control Enforcement was assigned to investigate Club X–Treme for allegedly selling beer without a license. Officer Weaver arrived at Club X–Treme at around 9:00 p.m. on the night of March

17th accompanied by two other police officers: David J. Rostis and Russell States. The three (3) officers were not in police uniforms but in "undercover" dress. Appellee, his brother, Lance Davis, and a waitress met the officers at the club entrance. Officer Weaver asked, "Where is the free beer?" and Appellee replied that "Six (6) dollars gets you access to the whole premises." N.T. Trial, 10/3/2000, at 6. Officer Weaver testified that he again asked, "Where is the free beer?" and that Appellee again said "Six (6) dollars gets you access to the whole premises."[1] *Id.* At this point Officer Weaver and the two other officers paid Appellee six (6) dollars and proceeded down the ramp and over to the lounge area.

¶ 6 Once there, each of the officers obtained a draft beer from a keg located behind a bar in the lounge. The officers remained inside the club for about forty-five (45) minutes. The officers then left the premises, obtained a search warrant, and returned. Upon their return, pursuant to the warrant, they confiscated five (5), fifteen and one half (15–1/2) gallon, kegs of beer. N.T. Trial, 11/7/2000, at 9. Appellee was then charged with violating the above-cited statutory provisions.

¶ 7 After a two (2) day non-jury trial the Trial Court found Appellee guilty. On January 12, 2001, the Trial Court sentenced Appellee for the violation of 18 Pa.C.S.A. § 7328 to three (3) months supervised probation. For the violation of 47 P.S. § 4–492(2) the Judge ordered Appellee to pay a fine of $100.00 as well as court costs totaling $212.50.

¶ 8 Appellee next filed post-sentence motions seeking a judgment of acquittal based on his claim that the evidence was

---

1. Appellee testified that Officer Weaver asked "where is the free beer" only once. N.T. Trial, 11/7/2000, at 38. However, due to the specific nature of our review, discussed *infra,* we are obliged to view the evidence in a light most favorable to the Commonwealth as verdict winner and resolve all conflicts accordingly.

insufficient to sustain his convictions and also seeking an arrest of judgment based on his contention that the guilty verdict was against the weight of the evidence. *See* Appellee's Motion to Modify Sentence, filed 1/22/2001. The Commonwealth also filed a motion to modify sentence requesting that the Appellee's sentence be altered to include the imposition of what it contended was the mandatory fine. The Commonwealth alleged in its motion that the correct amount of the fine that was required, based on the weight of the alcohol seized from the premises, was $20,480.00. *See* Commonwealth's Motion to Modify Sentence, filed 2/8/2001, at ¶ 3.

¶ 9 By order docketed April 23, 2001, the Trial Court granted Appellee's motion for judgment of acquittal and denied the Commonwealth's Motion to Modify Sentence. This timely appeal by the Commonwealth followed in which they present two (2) issues for our Court's consideration:

> I. WAS EVIDENCE THAT THREE UNDERCOVER OFFICERS, WHO PAID AN ADMISSION FEE AND WERE SERVED ALCOHOL, SUFFICIENT PROOF TO SUSTAIN THE TRIAL COURT'S ORIGINAL FINDING THAT DEFENDANT OPERATED A BOTTLE CLUB IN VIOLATION OF A BOROUGH ORDINANCE AND SOLD MALT OR BREWED BEVERAGES WITHOUT A VALID LICENSE?
>
> II. DID THE TRIAL COURT ERR IN NOT IMPOSING A MANDATORY FINE FOR VIOLATION OF THE LIQUOR CODE WHEN THE COURT HAS POWER TO CORRECT AN ILLEGAL SENTENCE AT ANYTIME?

Commonwealth's Brief at 1.

¶ 10 We begin by noting that Appellee has called our Court's attention to potential uncertainty as to the exact nature of the Trial Court's disposition. He notes that it is unclear whether the Trial Court's disposition was based on a finding that the verdict was against the weight of the evidence or whether it was based on a finding that the evidence was legally insufficient to sustain Appellant's conviction, i.e. that the Commonwealth had failed to prove each and every element of the offense charged beyond a reasonable doubt. Appellee's Brief at 10.

¶ 11 We acknowledge and understand the source of Appellee's confusion, since the Trial Court in its Opinion refers to both concepts when giving its reasons for granting the judgment of acquittal. In its Opinion the Trial Court said:

> After reviewing the record the Court now finds that the Commonwealth did not prove beyond a reasonable doubt that [Appellee] was operating a club in violation of 18 Pa.C.S.A. § 7328 and 47 P.S. § 4–492. It is clear that Officer Weaver asked where is the free beer. However, [Appellee's] reply of trying to sell them all the $6 entertainment fee is not a denial of free beer. The Commonwealth needed to go one step further and prove that the officers were actually denied free beer. The previous decision was against the weight of the evidence, and therefore, the Motion for Judgment of Acquittal is granted.

Trial Court Opinion, filed 4/23/2001, at 8.

¶ 12 Weight and sufficiency of the evidence are not one and the same legal concepts. As our Court has summarized in a prior case:

> Weight of the evidence and sufficiency of the evidence are discrete inquiries[.] In reviewing the sufficiency of the evidence, we must view the evidence presented and all reasonable inferences taken therefrom in the light most favorable to the Commonwealth, as verdict win-

ner. The test is whether the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt[.]

A motion for new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. Whether a new trial should be granted on grounds that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial judge, and his decision will not be reversed on appeal unless there has been an abuse of discretion. The test is not whether the court would have decided the case in the same way but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail.

*Commonwealth v. Merrick,* 338 Pa.Super. 495, 488 A.2d 1, 5 (1985) (quoting *Commonwealth v. Taylor,* 324 Pa.Super. 420, 471 A.2d 1228 (1984)); *See also Commonwealth v. Whiteman,* 336 Pa.Super. 120, 485 A.2d 459, 462 (1984) ("When a verdict of guilty is overturned on insufficiency of the evidence grounds, the double jeopardy clause of the Fifth Amendment to the United States Constitution precludes retrial. *Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). A new trial is a proper remedy when the verdict is found to be against the weight of the evidence.")

¶ 13 In this matter, the Trial Court was sitting without a jury and, therefore, acting as the finder of fact. The Trial Court adjudicated Appellee guilty after the completion of the bench trial. Even so, the Trial Court subsequently granted Appellee's post trial motion for a judgment of acquittal, which was based solely on Appellee's contention that the evidence was in-

sufficient to sustain his convictions. The Trial Court's order granting Appellee's post-trial motions stated only that it was granting the motion for judgment of acquittal. *See* Trial Court Order, entered 4/23/2001. However, the order did not dispose of the motion in arrest of judgment, which was based on Appellee's contention that the verdict was against the weight of the evidence. Indeed, the Trial Court could not have ruled in favor of both motions in this instance, since, as discussed, *supra,* a claim that a verdict was against the weight of the evidence concedes that there is sufficient evidence to support the verdict. Hence, it seems clear from its explicit choice to grant the motion for judgment of acquittal and not the motion in arrest of judgment, that the Trial Court rendered its decision based exclusively upon its conclusion that the evidence was insufficient as matter of law to sustain Appellee's conviction. Consequently, in reviewing the Trial Court's grant of a judgment of acquittal we will determine whether the evidence was legally sufficient to support the Trial Court's initial verdict of guilty. *Commonwealth v. Feathers,* 442 Pa.Super. 490, 660 A.2d 90, 94 (1995) (*en banc* ), *affirmed,* 546 Pa. 139, 683 A.2d 289 (1996); *Commonwealth v. Chiari* 741 A.2d 770, 774 (Pa.Super.1999).

¶ 14 "Evidence will be deemed sufficient to support [a guilty] verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Weston,* 561 Pa. 199, 749 A.2d 458, 461 (2000). "The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Com-*

monwealth v. DiStefano, 782 A.2d 574, 582 (Pa.Super.2001). In making a determination as to whether the evidence adduced at trial is legally sufficient to sustain a guilty verdict, we must evaluate the entire trial record and consider all the evidence actually received. *Id.; Commonwealth v. Rodriquez,* 449 Pa.Super. 319, 673 A.2d 962, 965 (1996). "[T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the trier of fact unless the evidence [is] so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Seibert,* 424 Pa.Super. 242, 622 A.2d 361, 363 (1993), *appeal denied,* 537 Pa. 631, 642 A.2d 485 (1994) (citing *Commonwealth v. Sullivan,* 472 Pa. 129, 371 A.2d 468, 478 (1977) and *Commonwealth v. Libonati,* 346 Pa. 504, 31 A.2d 95, 97 (1943)).

■ ¶ 15 We first consider whether the evidence adduced at trial was sufficient to convict Appellee of the offense of operating an illegal bottle club. The relevant statutory provision governing this offense provides:

§ 7328. **Operation of certain establishments prohibited without local option**

(a) **Offense defined.**—A person commits a misdemeanor of the third degree if that person operates an establishment commonly referred to as a bottle club in a municipality or part of a split municipality where the operation of such establishments has been disapproved by the voters in accordance with subsection (b). The provisions of this subsection shall not apply to the first 30–day time period following the adoption of the disapproval referendum under subsection (b).

(b) **Local option; election to be held.—**

(1) In any municipality or any part of a municipality where such municipality is split so that each part is separated by another municipality, an election may be held on the date of the primary election immediately preceding any general or municipal election, but not more than once in four years, to determine the will of the electors with respect to prohibiting the operation, within the limits of the municipality or part of a split municipality, of establishments commonly referred to as bottle clubs. Where an election shall have been held at the primary election preceding a general or municipal election in any year, another election may be held under the provisions of this subsection at the primary election occurring the fourth year after such prior election. Whenever electors equal to at least 25% of the highest vote cast for any office in the municipality or part of a split municipality at the last preceding general election shall file a petition with the county board of elections of the county, or the governing body of the municipality adopts by majority vote a resolution to place the question on the ballot and a copy of the resolution is filed with the board of elections of the county, for a referendum on the question of prohibiting the operation of establishments commonly referred to as bottle clubs, the said county board of elections shall cause a question to be placed on the ballot or on the voting machine board and submitted at the primary election immediately preceding the general or municipal election. The question shall be in the following form:

Do you favor the prohibition of the operation of establishments, commonly referred to as bottle clubs in _____ of _____?

(2) In the case of a tie vote, the status quo shall obtain. If a majority of the

electors voting on the question votes "yes," then an establishment commonly referred to as a bottle club shall not be operated in the municipality or part of a split municipality after 30 days from the certification of the vote on the question, but if a majority of the electors voting on the question votes "no," then the operation of these establishments shall be permitted in the municipality or part of a split municipality unless and until at a later election a majority of the voting electors votes "yes" on the question.

(3) Proceedings under this subsection shall be in accordance with the provisions of the act of June 3, 1937 (P.L. 1333, No. 320), known as the Pennsylvania Election Code.

(c) **Definition**—As used in this section, the term **"bottle club"** means an establishment operated for profit or pecuniary gain, which admits patrons upon the payment of a fee, has a capacity for the assemblage of 20 or more persons, and in which alcoholic liquors, alcohol or malt or brewed beverages are not legally sold but where alcoholic liquors, alcohol or malt or brewed beverages are either provided by the operator or agents or employees of the operator for consumption on the premises or are brought into or kept at the establishment by the patrons or persons assembling there for use and consumption. The term shall not include a licensee under the act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code, or any organization as set forth in section 6 of the act of December 19, 1990 (P.L. 1200, No. 202), known as the Solicitation of Funds for Charitable Purposes Act.

18 Pa.C.S.A. § 7328 (emphasis in original).

¶ 16 It is axiomatic that "[w]hen interpreting a statute words must be given their plain meaning, unless doing so would create an ambiguity, and we must inter-pret statutes in accordance with the legislative intent." *Semasek v. Semasek,* 509 Pa. 282, 502 A.2d 109, 111 (1985); *See also* 1 Pa.C.S.A. § 1903(a) ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage [.]"); *Hull v. Rose Schmidt, Hasley and Disalle,* 700 A.2d 996, 999 (Pa.Super.1997) ("[S]tatutes are presumed to employ words in their popular and everyday sense and the popular meaning of such words must prevail.") Thus, a plain reading of the statutory language of Section 7328 establishes that in order for a defendant to be found guilty for operating an illegal bottle club the Commonwealth must prove, beyond a reasonable doubt, the existence of all of the following factors: 1.) the defendant operates an establishment for profit or pecuniary gain in which alcoholic, malt or brewed beverages can not be legally sold, 2.) the establishment being operated by the defendant has a capacity for the assemblage of twenty (20) or more persons, 3.) the establishment admits patrons upon payment of a fee, 4.) alcoholic, malt or brewed beverages are provided by the defendant, or the defendant's agents or employees, for consumption, or, alternatively, patrons or other persons assembling on the premises of the establishment are permitted to bring into or keep at the establishment alcoholic beverages for their use and consumption, and 5.) a majority of the voters of the municipality in which the establishment is located have previously voted to prohibit the operation of bottle clubs in an election held in the manner prescribed by subsection (b) of Section 7328.

¶ 17 In the case *sub judice,* the evidence of record indicates that on January 7, 1997 the Indiana Borough Council voted to place on the primary election ballot for that year a referendum question, which was structured in accordance with subsec-

tion (b) of Section 7328, and which asked: "Do you favor the prohibition of the operation of establishments commonly referred to as 'bottle clubs' in the Borough of Indiana." N.T. Trial, 11/7/2000, at 6; Commonwealth's Exhibit 1. In the primary election held on May 20, 1997, the results of which were certified on June 12, 1997, the voters of the Borough of Indiana voted in favor of prohibiting bottle clubs by a margin of 824–387. Thus, pursuant to subsection (b) of Section 7328, thirty (30) days from the date of the certification of the election results, the operation of a bottle club within the Borough of Indiana became illegal. The thirtieth day after June 12, 1997 was Sunday July 12, 1997; hence, the ban on bottle clubs became operative on the next business day, which was Monday July 13, 1997. *See* 1 Pa. C.S.A. § 1908 ("Whenever the last day of any [period of time referred to by a statute] shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation.") Consequently, it is clear that on the day of Appellee's arrest, the operation of a bottle club within the Borough of Indiana had been rendered illegal by its voting citizenry almost three (3) years earlier.

¶ 18 The evidence of record also clearly shows that Appellee was the owner of the establishment known as Club X–Treme and that he did not have a license to sell liquor at Club X–Treme. It is also uncontested that Appellee operated Club X–Treme for profit and that it was capable of holding more than twenty (20) persons. Also, the evidence establishes that an alcoholic beverage, specifically beer, was furnished by Appellee on the premises of Club X–Treme for consumption by both paying and non-paying customers.

¶ 19 Appellee contends, however, that the evidence also established that he did not charge a fee for admittance to the establishment for individuals who wished to consume free beer. Thus, he maintains that "since business patrons were able to enter Club X–Treme without payment of a fee, and were able to obtain free beer, without payment of any kind, the Commonwealth has failed to prove an essential element of the 'bottle club' law in that they failed to prove Club X–Treme 'admits patrons upon the payment of a fee.' " Appellee's Brief at 13–14.

¶ 20 The Commonwealth asserts that whether the fee was optional for some individuals and mandatory for others is irrelevant. The Commonwealth argues that the evidence clearly established that Appellee nonetheless charged an admittance fee to those individuals wishing to use the entertainment facilities. Hence, according to the Commonwealth, since Appellee admitted patrons "upon the payment of a fee" he was in violation of the statute. Commonwealth's Brief at 9.

¶ 21 After review and consideration we are constrained to agree with the Commonwealth's interpretation of the statutory language in question. Since Section 7328 is a penal statute we are required to strictly construe the language contained therein. 1 Pa.C.S.A. § 1928. "However, strict construction does not require that the words of a criminal statute be given their narrowest meaning or that the legislature's evident intent be disregarded." *Commonwealth v. Diakatos,* 708 A.2d 510, 511 (Pa.Super.1998) (quoting *Commonwealth v. Gordon,* 511 Pa. 481, 515 A.2d 558, 561 (1986)). "In determining the meaning of a statute we are obliged to consider the intent of the legislature and give effect to that intention." *Commonwealth v. Campbell,* 758 A.2d 1231, 1233 (Pa.Super.2000); 1 Pa.C.S.A. § 1921. In

interpreting a statute to ascertain the intent of the legislature, "[w]e are to give the words of a statute their plain and ordinary meaning." *Id.* at 1234.

¶ 22 Section 7328 simply states that one of the requirements that must be met for an establishment to be considered a bottle club is that it admits "patrons for a fee." The statute does not say "all patrons" but rather, simply, patrons. The plain meaning of the term "patron" is "a person who is a customer, client or paying guest." ***Webster's Unabridged Dictionary,*** Second Edition, at 1442.[2] Thus, patrons who are admitted for a fee are paying customers of the establishment. Consequently, by the plain language of the statute, in order for the Commonwealth to meet its burden of proof with respect to this element of the offense it is sufficient for the Commonwealth to show that the establishment charged certain people or individuals a fee for the privilege of entering the premises of the establishment. The statute does not require, though, that the Commonwealth show that the establishment charged every person who entered an entry fee for their admission to the premises.

¶ 23 Indeed, other statutory language suggests that the legislature was aware of and considered the fact that some individuals may enter the establishment and remain on the premises without having paid any fee whatsoever. Later in the same sentence in which the word patrons is first used, the statute, when referring to the class of individuals potentially bringing into or keeping alcoholic beverages on the premises of the establishment, uses the terms "patrons ***or persons assembling there.***" Thus, it seems obvious that the legislature did not use the term patrons earlier in the same sentence so broadly as to encompass all individuals entering the establishment. Had the legislature viewed patrons to mean all individuals entering the establishment, the later use of the terms "patrons or persons assembling there" in the same sentence would not have been necessary. Rather, this language instead indicates that the legislature conceived of the possibility that an establishment being operated as a bottle club would admit both paying and non-paying individuals to its premises.

¶ 24 It is plain, then, that the legislature elected not to include language in Section 7328 requiring, as a necessary element of proof that an establishment is being operated as a "bottle club," a showing that the establishment makes all individuals pay a fee for the right to enter its premises. "We may not add provisions [to a statute] which the legislature has omitted unless the phrase is necessary to the construction of the statute." *Commonwealth v. Berryman,* 437 Pa.Super. 258, 649 A.2d 961, 965 (1994) (*en banc*), appeal denied, 541 Pa. 632, 663 A.2d 685 (1995). We will therefore not add words instantly since the meaning of the statutory language is clear. So long as the Commonwealth demonstrates beyond a reasonable doubt that some persons are being charged a monetary fee by the establishment for the right to enter the premises, for whatever reason, the statutory requirement is met.

¶ 25 Were we to construe the statute in the manner Appellee suggests, it would lead to an absurd result. An operator of a bottle club could circumvent the statute simply by charging an admission fee, but then exempting every twentieth or thirtieth person, etc. walking through the door from payment of the fee. This is clearly

2. *See Fogle v. Malvern Courts,* 554 Pa. 633, 722 A.2d 680, 682 (1999) (approving dictionaries as source material for determining the common and approved usage of a term).

not a result which the legislature intended. It is axiomatic that in interpreting a statute we may presume that the legislature did not intend an absurd or unreasonable result. 1 Pa.C.S.A. § 1922(1). We may therefore "examine the practical consequences of a particular interpretation." *Diakatos, supra,* 708 A.2d at 512. Thus, since the evidence of record clearly shows beyond a reasonable doubt that certain individuals entering Club X–Treme were charged an entry fee, this element of the offense has been established as well. As a result, since all of the requisite statutory elements have been shown to be present, Appellee's conviction for violation of Section 7328 was proper. We therefore reverse the Trial Court order granting a judgment of acquittal for this offense and reinstate the Trial Court's original verdict of guilty. *C.f. Chiari, supra,* 741 A.2d at 776 (Superior Court reversed trial judge's entry of judgment of acquittal and reinstated the jury's original verdict).

¶ 26 We turn now to the question of whether, on the night of his arrest, Appellee was operating Club X–Treme in violation of the Liquor Code. The relevant provision of the Liquor Code which Appellee was alleged to have violated provides as follows:

§ 4–492. **Unlawful acts relative to malt or brewed beverages and licensees**

It shall be unlawful—

\* \* \* \* \*

Sales of malt or brewed beverages for consumption on the premises

(2) For any person, to sell to another for consumption upon the premises where sold or to permit another to consume upon the premises where sold, any malt or brewed beverages, unless such person holds a valid retail dispenser license or a valid liquor license issued by the board authorizing the sale of malt or brewed beverages for consumption upon such premises.

47 P.S. § 4–492(2). Our review of the evidence introduced at trial compels us to agree with the Trial Court's conclusion that it was insufficient to sustain Appellee's conviction for a violation of this statutory section, since the evidence did not establish beyond a reasonable doubt that Appellee was selling beer.

¶ 27 Officer Weaver testified in relevant part as to what transpired when he attempted to enter Club X–Treme:

Q. And what you said to the three individuals standing [at the Club entrance] was, where's the free beer; is that correct?

A. Yes.

Q. And there were signs there indicating there was free beer to be on tap?

A. Yes, I believe there was a marquis sign outside.

Q. And when you asked about the free beer, you were told, $6 will get you access to the entire building; is that correct?

A. Yes.

Q. And then you asked the second time about the free beer; is that correct?

A. Yes.

Q. And were you again given another sales pitch saying, $6 would get you entrance to the whole building; correct?

A. Yes.

Q. At which time the three of you then offered $6 to pay to gain entry; correct?

A. Yes.

Q. To gain access to the entire building?

A. Yes.

Q. At no time were you told by any individuals at this club that you would

be denied access to get the free beer if you didn't pay the $6; isn't that correct?

A. That's correct.

Q. And you essentially never got an answer to your question about where's the free beer and how can we just come in and get free beer; is that correct?

A. I took it as, I am not going to stand and argue with the person and I asked if I could get free beer and if they tell me $6 gets me access to the whole premises, I assume that the $6, I had to pay the $6 to get in or to get down to where the beer was.

Q. And that was an assumption on your part; correct?

A. Yes.

Q. Okay. You never said I don't want to pay $6 and I just want to come in and get the free beer; did you?

A. No.

Q. No one with you said that; is that correct?

A. No.

Q. No one else said it?

A. No, no one else stated that.

N.T. Trial, 10/7/2000, at 10–11.

¶ 28 As the Trial Court noted:

Officer Weaver had previously investigated this club and found that it complied with the law. On the previous visit, Officer Weaver was required to show identification, and was then told that he could get a free beer, although a $5.00 fee was required for access to other areas of the club.

Based on the difference in the entry procedures, Officer Weaver decided that the access to the free beer was not as clear the second time he investigated the club on March 17, 2000. Although Officer Weaver admitted that the white male at the entrance was trying to sell them on the $6 admission charge, he also equated the communication as a denial of free beer.

Trial Court Opinion, *supra* at 5.

¶ 29 Even though Officer Weaver subjectively believed that the difference in entry procedures constituted a denial of free beer, as the following testimony shows, he acknowledged that he did not specifically request just the free beer nor was he denied free beer:

Q. And on March 17 when you and the officers went in, you never said, we're not interested in paying $6; we only want free beer and you never said that; did you?

A. No. I said, where's the free beer twice.

Q. He tried to sell you on the $6.00 admission charge; right?

A. Well, I guess.

Q. And that is what he did right?

A. Well, I believe that, the first night I went in I went in and said, where's the free beer and then this when [a fellow LCB Officer] went in and we were told this is what this is and this is what this is. And you get in here you have to pay five bucks but you can go down and drink free beer down here. And this night we went in and I said, where's the free beer and he, and we were told $6 to gain entrance to the whole premises.

Q. Nobody denied you free beer, right?

A. No.

Q. Nobody said that if you want beer you got to pay $6 to come in here and get the beer; correct?

A. No they didn't say that.

N.T. Trial, 10/7/2000, at 17.

¶ 30 One of the other officers who accompanied Officer Weaver, Deputy David J. Rostis testified that signs outside the

club indicated that there was entertainment as well as free beer. *Id.* at 21. During his very brief testimony, Deputy Rostis testified he could not remember having a conversation with anyone in charge of the premises, but he could remember paying the $6 before he went down the ramp. *Id.* at 22.

¶ 31 The third Commonwealth witness was Officer Russell States. He was asked on direct examination to describe the exterior of the building and the sign out front. Officer States replied that the lighted sign outside the building contained the words "free beer" on it, and that there was also a revolving beacon on top of the sign indicating that the club was open. *Id.* at 27–28. Once inside the door, Officer States paid six (6) dollars to Appellee. *Id.* at 29. He then received a cup and went down the ramp on the right hand side of the entryway, and from there he went over into the lounge area and obtained a beer. *Id.* at 30.

¶ 32 States, like Weaver, also testified that he was never told that he had to pay the six (6) dollar fee to get beer. *Id.* at 33. States also acknowledged that no one ever told him that there was no free beer. *Id.* He remembered only that Appellee stated that a six (6) dollar fee would ensure access to the entire building. *Id.*

¶ 33 The defense consisted of the testimony of Appellee, as well as that of Lance Davis, his brother, and Misty Dawn Deyarmin, a waitress. Miss Deyarmin was working at Club X–Treme's ticket booth on the night of March 17, 2000. Miss Deyarmin described the aforementioned physical features of the premises, i.e. once a patron entered there were 2 ways to proceed into the club, there was a stairway to the beer area for those who just wanted to drink free beer and there was a ramp for entry to the general entertainment area. *Id.* at 36. According to Miss Deyar-min the club was arranged this way from the time that Appellee first began to offer free beer. *Id.* Miss Deyarmin testified that in her experience working at the club no one who entered the club desiring only free beer had ever been denied access to it. *Id.* at 37.

¶ 34 Miss Deyarmin recalled that on the night of March 17, 2000, when the three officers came into the club, Appellee informed them about the arrangement of the club and that for six (6) dollars they could go into the lounge and dance floor and game room and that there was free beer on top of that. *Id.* at 40. Miss Deyarmin testified that the three (3) officers had no objections and they simply paid their fee and went down the ramp. She stated that none of the officers ever insisted that they simply wanted free beer or declined to pay the fee. *Id.* at 40–41.

¶ 35 Lance Davis, the proprietor's brother, was the second witness for the defense. He testified that if one entering the club indicated he or she wanted free beer they were directed to the beer room via the stairs on the left hand side of the entrance. If a person wished to go down the ramp to the entertainment area of the club, he or she needed to pay the six (6) dollar fee. *Id.* at 47. He also testified no one who entered the club seeking free beer was ever denied access to it, and he personally recalled instances where people who entered the club did not pay the cover and simply drank the beer. *Id.* at 48.

¶ 36 With respect to the events which occurred on the evening of March 17, 2000, Lance Davis testified as follows:

> Q. Did any of the three gentlemen insist they simply wanted free beer and did not want to pay an admission fee?
>
> A. No
>
> Q. Did anyone deny them free beer?

A. No, sir.

*Id.* at 48.

¶ 37 Mr. Joseph Mullenterno was the operations supervisor in the employ of the Pennsylvania State Police, Bureau of Liquor Control Enforcement, and he was called as a witness for the defense. Mullenterno testified that Appellee had contacted him indicating that he was going to open a club in Indiana and give away free beer. In response to Appellee's query as to whether he needed a license to do so, Mullenterno indicated that he told Appellee that there was no licensing requirement if Appellee intended to give the beer away for free to sober individuals over the age of twenty-one (21). *Id.* at 20–21. Mullenterno testified that it would be legal to operate a club which offered entertainment for an admission price, and also offered free beer, just so long as "there was no requirement by the patron that they had to pay any kind of fee in order to get what was deemed as free alcohol[.]" *Id.* at 21. Mullenterno specifically acknowledged that he told Appellee: "[I]f he operated the club where there was no requirement that someone had to pay an admission price or purchase anything in order to obtain the free beer then it would not be a sale without a license." *Id.* at 21–22. Mullenterno also stated, however, that he did not give specific advice on compliance with the Bottle Club Statute since he was not an expert on that law. *Id.* at 21. Mullenterno recalls that Appellee contacted him several more times after that with specific questions that he had on the operation of the club. Mullenterno agreed that Appellee's contacts were an apparent effort by Appellee to insure that he could legally and properly operate his establishment while providing both entertainment and beer. *Id.*

¶ 38 Appellee testified on the great effort he and his mother made in making his place of business attractive to his patrons. He also testified to his frequent contacts with Mr. Mullenterno prior to opening the club due to his wish to operate the club in a lawful manner. *Id.* at 29–30. He recalled that Mr. Mullenterno explained to him, as Mullenterno had testified, how to legally operate his business. *Id.* at 30.

¶ 39 Appellee also explained how he deliberately arranged his business to separate the area where free beer would be distributed to non paying entrants from the areas of the club in which entertainment was provided to paying customers. To achieve this separation, he described how he renovated the club to provide one exclusive entrance to the free beer area, the lounge, and another separate entrance to the entertainment area. *Id.* at 30–33. He explained that the six (6) dollar charge provided access for the patrons to the entertainment area and also to the lounge. However, if individuals indicated that they only wanted free beer they were given a free cup and they were permitted to go down the stairs into the lounge. *Id.* Appellee emphasized that neither he nor his employees ever charged any money for beer or ever turned away individuals who requested just the free beer. *Id.* at 35–36. Appellee recalled that during the time that he operated the club in this manner, from late 1999 to March 17, 2000, people did come in and request only the free beer, and these individuals were never charged any money. *Id.* at 35.

¶ 40 Appellee recalled that none of the police officers on the evening of March 17, 2000 indicated that they merely wanted free beer. *Id.* at 37. Appellee testified that he explained to them about the six (6) dollar all access entertainment fee. He stated that the officers elected to simply pay the six (6) dollar entertainment fee and at no time indicated that they wished just the free beer. *Id.* Appellee testified

that the six (6) dollar fee was only to allow entry into the entertainment facilities of the club. *Id.*

¶ 41 Our review of all of the above-recited testimony indicates that one could have entered Club X–Treme on the night of March 17, 2000 and obtained free beer without the payment of a fee. The testimony of the officers, even when viewed in a light most favorable to the Commonwealth as verdict winner, establishes merely that Appellee made a sales pitch to the undercover officers in an attempt to entice them to pay the six (6) dollar fee so that they could use the entertainment facilities of Club X–Treme. The evidence does not show that the officers or any other individuals were required to pay a fee to gain access to the beer which was available on the premises, or that access to the beer was being denied unless a fee was paid. Indeed, none of the officers ever indicated to Appellee that they did not wish to pay the entertainment fee and wanted only free beer. They merely acquiesced to Appellee's sales pitch and paid the six (6) dollar entertainment access fee. There is nothing of record to show that they would have been barred from access to the beer if they did not pay the entertainment fee. Consequently, since the Commonwealth did not establish beyond a reasonable doubt that individuals entering Club X–Treme were required to pay some sort of monetary fee to obtain the beer on the premises, and since the evidence, in fact, indicated that Appellee was giving away beer freely to anyone who desired it, the Commonwealth has not established beyond a reasonable doubt that Appellee was selling beer in violation of Section 4–492 of the Liquor Code. To the contrary, the evidence showed at most that Appellee was selling access to entertainment, not beer.

¶ 42 The unique facts of this case distinguish it from *Commonwealth v. Backa,* 225 Pa.Super. 224, 310 A.2d 355 (1973) which the Commonwealth relies upon in support of its contention that Appellee's conviction was proper. In *Backa* the proprietor of an establishment had a sign outside the establishment which said **"Swimming, Dancing and Free Beer, $3.00."** *Id.* All patrons entering the establishment paid the three (3) dollar fee. Inside the establishment a band was playing and there was a swimming pool. A bar was set up inside at which plastic cups of beer were being passed out to patrons who wished to consume it. The operator of the establishment was arrested and charged with selling beer without a license, in violation of Section 4–492 of the Liquor Code.

¶ 43 The trial judge in the matter had concluded that there was no sale of beer since there was no specific amount of the three dollar entry fee which was stated to be a consideration for the beer, nor was there any other consideration paid by the attendees to obtain the beer. The trial court viewed the beer as a mere "inducement to attend a function." *Id.* at 356.

¶ 44 Our Court however rejected this argument and viewed the admission price as a whole to include consideration for the obtaining of the beer. Our Court said:

> The fact that a few of the patrons did come to swim and dance and did not drink any beer does not negate the finding that the admission price included therein a consideration for the beer. ***Those patrons had the right to drink beer if they so chose because they had paid for it.*** A person being served in the restaurant may, without any reduction in the price of the meal, decline the potato included with the meal he has ordered, but that does not mean the price he paid for the meal does not include the cost of the potato.

*Id.* at 357 (emphasis supplied).

¶ 45 Thus, in stark contrast to the facts of the case *sub judice,* **all individuals**

entering the establishment in *Backa* were required to pay a fee to enter. Part of what the individuals received in *Backa* as consideration for the payment of their entry fee was the right to consume the beer available on the premises. Whether they exercised that right was irrelevant, they nonetheless received that right to consume beer in exchange for the payment of their fee. Entering individuals could not have gotten access to the beer unless they paid the three (3) dollar fee.

¶ 46 In the case *sub judice*, beer was being freely offered to anyone who desired it, with no tender of monetary consideration required on the part of a person desiring access to the beer. The beer was equally obtainable, with or without payment of the fee; hence in this case, unlike in *Backa*, the right to consume beer was not an additional consideration being offered in exchange for payment of the entry fee. In the instant matter, the only additional consideration which an individual received in exchange for the payment of the six (6) dollar fee was the right to use the entertainment facilities of Club X–Treme. Consequently, since Appellee in the instant matter was not offering the right to consume beer in exchange for the payment of monetary consideration, he could not be found guilty of selling beer without a license in violation of Section 4–492 of the Liquor Code. The decision of the learned Trial Judge to reverse Appellee's conviction on this charge was therefore proper.

¶ 47 Having determined that the Trial Court's order granting Appellee's judgment of acquittal on the charge of illegally selling beer without a license was correct, we need not address the Commonwealth's second issue concerning the Trial Court's alleged failure to impose the proper fine for conviction on this charge.

¶ 48 Order docketed April 23, 2001 is affirmed to the extent that it granted Appellee's Motion for Judgment of Acquittal on the charge of violating 47 P.S. § 4–492, and it is reversed to the extent that it granted Appellee's Motion for Judgment of Acquittal on the charge of violating 18 Pa.C.S.A. § 7328. The original verdict of the Trial Court is reinstated with respect to the latter charge only, and the case is remanded for the imposition of sentence. Jurisdiction is relinquished.

¶ 49 Todd, J. concurs in the result.