J-A29042-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JEROME LIVINGSTON :
:
Appellant : No. 1683 EDA 2017

Appeal from the Judgment of Sentence April 28, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008510-2015

BEFORE: OTT, J., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.: **FILED DECEMBER 27, 2018**

Appellant, Jerome Livingston, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction at a bench trial on the charges of criminal conspiracy (simple assault), possession of firearms prohibited, firearms not to be carried without a license, criminal trespass, carrying firearms in public in Philadelphia, possession of an instrument of crime, simple assault, and recklessly endangering another person.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested, and on October 14, 2016, represented by counsel, he proceeded to a bench trial. At trial, Niketta Burnside testified that, on June 23, 2015, she

_____

[1] 18 Pa.C.S.A. §§ 903, 6105, 6106, 3503, 6108, 907, 2701, and 2705, respectively.

_____

* Former Justice specially assigned to the Superior Court.

was living at 45th and Market Streets in Philadelphia with her children and then paramour, Dennis Scott. N.T., 10/14/16, at 11. At 4:30 a.m., she awoke to feed her infant and discovered the residence had no electrical power. *Id.* She heard someone outside yelling, "Power outage. Power outage." *Id.*

Ms. Burnside proceeded downstairs to the area where Mr. Scott was asleep and spoke to him about the lack of electricity in the residence. *Id.* Suddenly, someone knocked on the front living room window, and Mr. Scott opened the front door. *Id.* A man, who Ms. Burnside identified in court as Appellant's co-defendant, Richard Cook, informed the couple that he was "letting the neighbors know that there was a power outage." *Id.* at 12.

Ms. Burnside testified she shut the front door, and the couple sat in the living room. *Id.* at 13. Ms. Burnside noticed the houses across the street appeared to have electricity, so Mr. Scott went into the backyard to investigate further. *Id.* The backyard was illuminated by a security light in the complex's courtyard. *Id.* at 13, 53, 59. As Mr. Scott stood outside the back door, Ms. Burnside observed as a man, who Ms. Burnside identified in court as Appellant, entered the backyard and pointed a gun at Mr. Scott. *Id.* at 13. Appellant came within ten feet of Mr. Scott and said, "Don't move." *Id.* at 15.

Ms. Burnside ran upstairs with her infant, locked herself in a bedroom with her other child, and called 911. *Id.* at 16. The police arrived within five or ten minutes. *Id.* at 23, 56. The police presented her with Appellant, who

- 2 -

the police had apparently captured, and she positively identified him as the person who had been in her backyard. *Id.* at 22-23.

The next day, Ms. Burnside examined her property to determine the reason her residence had no electrical power. *Id.* at 23-24, 54. She discovered that a main breaker box in the backyard had its power switched to the "off" position. *Id.* at 24. When she flipped the switch to the "on" position, electrical power was restored to her home. *Id.* She testified that the breaker box controlled the electricity solely to her residence. *Id.*

Ms. Burnside testified that, prior to the incident on June 23, 2015, she had never met Appellant or Mr. Cook, and neither man had permission to be on her property. *Id.* at 27. She also testified that Mr. Scott showed no indication that he was acquainted with either man prior to June 23, 2015, and Mr. Scott did not invite the men over at 4:30 a.m. *Id.* at 54-55.

Sergeant Arthur Anderson testified that he was the first supervising officer on the scene, and he, along with another officer, approached the backyard of the subject property, where they were met by Mr. Scott. *Id.* at 74. Sergeant Anderson testified Mr. Scott was nervous, afraid, and announced that he had just been robbed at gunpoint. *Id.* at 81. Mr. Scott was "screaming" and speaking very quickly. *Id.* Mr. Scott told the Sergeant that "the males were at the back of the residence [and] [t]hey fled out the back of the property upon police arrival." *Id.*

Sergeant Anderson testified that the police had been provided with information that they "were looking for two suspects. Suspect number one was a [] black male wearing all black clothing. Second suspect was a black male, muscular build, wearing a gray shirt with a white shirt underneath." *Id.* at 87. Sergeant Anderson set up a perimeter around the scene to look for the suspects.

Police Officer Joseph Digangi testified that he was directed by Sergeant Anderson to check the area for suspects, and he found Appellant hiding in a bush in the backyard of the subject premises. *Id.* at 114-15.

Police Officer Christopher Campbell testified that he was part of the police perimeter ordered by Sergeant Anderson. *Id.* at 120. He confirmed that Appellant was hiding under a bush behind the subject house and was arrested by Officer Digangi. *Id.* at 120-21. He also testified that, at approximately 5:35 a.m., he went to the rear of the courtyard of the houses on the 4500 block of Market Street, and he climbed onto construction scaffolding and ladders that were in the yard at 20 South 45th Street. *Id.* at 121. He observed Mr. Cook, who was texting on a cellphone, squatting down and leaning against a fence in the backyard of 22 South 45th Street. *Id.* at 122, 133. Officer Campbell testified that Mr. Cook's location was approximately twelve or fifteen feet from where Appellant was found hiding in a bush. *Id.*

Officer Campbell ordered Appellant to "show his hands[,]" and Mr. Cook fled, eventually entering a residence located at 24 South 45th Street via a window. *Id.* at 122. Officers entered the residence, and Officer Campbell discovered Mr. Cook hiding in a closet in a second floor bedroom. *Id.* After a struggle, the police handcuffed Mr. Cook. *Id.*

Following the capture of Mr. Cook, Officer Campbell proceeded to the rear yard of 22 South 45th Street. *Id.* at 124. He observed a small gap in the wooden picket fence between the houses on 20 and 22 South 45th Street, and inside the gap he "observe[d] a black handgun, and a clear plastic bagg[ie] with a large amount of off-white, chunky substance[.]" *Id.* at 124-25. He testified that it would have been easy for Mr. Cook to reach from the rear yard of 22 South 45th Street and drop the items into the gap. *Id.* at 125. Officer Campbell testified that, when he initially observed Mr. Cook squatting down in the rear yard of 22 South 45th Street, he was "less than arm's reach [and] snugged up against" the gap in the fence from which the gun and baggie were recovered. *Id.* at 142-43.

Detective Rudolph Valentine testified that he processed the scene and the baggie testified positive for crack cocaine. N.T., 10/17/16, at 33-34. He also testified the firearm seized from the fence was a loaded .40 caliber firearm. *Id.* at 34-36. Appellant had $3,000 in cash on his person at the time of his arrest. *Id.* at 37. Detective Valentine testified the crack cocaine was actually a "brick." *Id.* at 45.

The parties placed numerous stipulations on the record, including the fact Appellant was ineligible and not licensed to possess a gun on June 23, 2015; the substance in the baggie tested positive for cocaine and weighed 99.046 grams; and the seized firearm was operable. *Id.* at 69-74. Further, the parties stipulated that, if the Commonwealth called Police Officer Craig Perry to testify, he would testify that he attempted to lift latent fingerprints from the firearm but the results were negative for fingerprints. *Id.* at 69. Officer Perry would further testify that he swabbed the firearm for DNA. *Id.* at 70.

Moreover, the parties stipulated that, if the Commonwealth called Lisette Vega, who is assigned to the Philadelphia Police Department DNA Lab, to testify, she would testify that she analyzed samples of DNA taken from Appellant and Mr. Cook. *Id.* at 71-72. She found partial DNA in the handle, magazine release, and trigger area of the firearm; however, due to insufficient data, the samples were inconclusive as to Appellant and Mr. Cook. *Id.* at 72. She also found DNA in the empty magazine, which is located inside the firearm, but Appellant and Mr. Cook were excluded as contributors for the DNA. *Id.*[2]

---

[2] As the trial court noted in its opinion, Mr. Scott did not testify at trial. Trial Court Opinion, filed 10/11/17, at 2 n.1. Following the incident at issue, Ms. Burnside and Mr. Scott "broke up," and the police were unable to maintain contact with Mr. Scott. *Id.*

Based on the aforementioned, the trial court convicted Appellant of the offenses indicated *supra*. On April 28, 2017, Appellant proceeded to a sentencing hearing, at the conclusion of which the trial court imposed an aggregate of six and one-half years to thirteen years in prison, to be followed by five years of probation. Appellant filed a timely, counseled post-sentence motion, which the trial court denied. This timely, counseled appeal followed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant timely complied. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant sets forth the following issues in his Statement of Questions Presented (verbatim):

A. Did not the trial court err and abuse its discretion in denying Appellant's motion to set aside the verdict on all charges as against the weight of the evidence, particularly in light of the sole identifying witness' poor opportunity to observe the perpetrator, the vague physical description she provided, and the highly suggestive circumstances surrounding her post-incident identification of Appellant?

B. Did not the trial court violate Appellant's rights under the Confrontation Clause of the federal Constitution by relying improperly on hearsay statements for the purpose of the truth of the matter asserted, as the statements were testimonial in nature, the declarant was proven to be unavailable, and Appellant had no prior opportunity to cross-examine the declarant?

Appellant's Brief at 4.

In his first issue, Appellant contends the trial court's verdict is against the weight of the evidence. Specifically, Appellant contends the verdict relies

on Ms. Burnside's questionable identification of Appellant as the person who

approached Mr. Scott in the backyard at gunpoint.[3]

> [T]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. . .thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. . .rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Kim***, 888 A.2d 847, 851 (Pa.Super. 2005) (citations and

quotations omitted).   A motion for a new trial based on a challenge to the

weight of the evidence concedes the evidence was sufficient to support the

verdict.  ***Commonwealth v. Davis***, 799 A.2d 860, 865 (Pa.Super. 2002).

In rejecting Appellant's claim, the trial court indicated that it weighed

the evidence and found Ms. Burnside's identification testimony to be credible,

as well as reliable.  **See** Trial Court Opinion, filed 10/11/17, at 8.  Further, the

trial court noted Ms. Burnside's identification was supported by the fact the

police found Appellant hiding under a bush in the residence's backyard soon

after the incident occurred.  ***Id***.  The record supports the trial court's decision

to reject Appellant's challenge to the weight of the evidence, and we see no

---

[3] Appellant sufficiently preserved this issue in his post-sentence motion. **See** Pa.R.Crim.P. 607.

reason to disturb that decision. *See Kim*, *supra* (stating our standard of review).

In his next issue, Appellant contends the trial court violated his confrontation rights when it admitted testimony from Sergeant Anderson concerning out-of-court statements made by Mr. Scott, who did not testify at trial.[4] Appellant complains that Mr. Scott's statements were the product of police questioning when there was no ongoing emergency. As such, he contends the statements were testimonial in nature, and thus, the statements should not have been introduced since Mr. Scott did not testify at trial and was never subject to cross-examination.

Initially, we note that "[an] assertion of a Confrontation Clause violation presents an issue of law. [Thus,] [o]ur scope of review is plenary and our standard of review is *de novo.*" *Commonwealth v. Williams*, 103 A.3d 354, 358 (Pa.Super. 2014) (citation omitted).

Relevantly, the Pennsylvania Supreme Court has explained:

> Under both the United States Constitution and the Pennsylvania Constitution, the right to confrontation specifically guarantees a person accused of a crime the right to be confronted with the witnesses against him. As the United States Supreme

---

[4] Appellant challenges the following portion of Sergeant Anderson's testimony: Upon approach to the rear of [the subject residence], I was approached by a gentlemen that later identified himself as Dennis Scott. He was claiming that he was robbed at point of gun, and that the males were at the back of the residence. They fled out the back of the property upon police arrival.
N.T., 10/14/16, at 81.

Court has explained, the right to confrontation is basically a trial right, and includes both the opportunity for cross-examination of the witnesses and the occasion for the [fact-finder] to consider the demeanor of the witnesses. The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.

***Commonwealth v. Williams***, 624 Pa. 183, 84 A.3d 680, 684 (2014)

(citations, quotation marks, and quotations omitted).

Further, in examining the jurisprudence regarding the Confrontation Clause, this Court has noted:

[T]he principle evil at which the Confrontation Clause was directed was the civil-law mode of procedure, and particularly its use of *ex parte* communications as evidence against the accused. Likewise, the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination. The [United States Supreme] Court [in the seminal case of ***Crawford v. Washington***, 541 U.S. 36, 124 S.Ct. 1354 (2004)] found no occasion to offer a comprehensive definition of [the term] testimonial. Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.

\* \* \*

[In a decision following ***Crawford***, the United States Supreme Court in ***Davis v. Washington***, 547 U.S. 813, 126 S.Ct. 2266 (2006)] distinguished testimonial and nontestimonial hearsay:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove

- 10 -

past events potentially relevant to later criminal prosecution.

The [United States] Supreme Court confirmed that the protection of the Confrontation Clause attaches only to testimonial hearsay.

* * *

[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. The existence of an ongoing emergency is important because it indicates that the declarant's purpose in speaking was to help resolve a dangerous situation rather than prove past events[.]

***Williams***, 103 A.3d at 358-61 (citations, quotation marks, and quotations omitted).

More recently, in ***Ohio v. Clark***, ___ U.S. ___, 135 S.Ct. 2173 (2015), the United States Supreme Court added that, in determining whether statements are testimonial or non-testimonial, we should also consider the "informality of the situation and the interrogation," because a less formal situation is "less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." ***Clark***, ***supra*** at 2180.[5]

---

[5] We recognize that, in ***Clark***, ***supra*** at 2175, the High Court held that "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." However, as discussed in detail *infra*, we conclude Mr. Scott's challenged statements were made to the police during an ongoing emergency, and therefore, we need not discuss ***Clark's*** "other circumstances" holding further.

In the instant case, we conclude Mr. Scott's statements, which were made to Sergeant Anderson as soon as the police arrived on the scene and described Appellant's actions immediately prior to the officers' arrival, were made with the purpose of assisting the police with an ongoing emergency.[6] As the trial court noted, the ongoing nature of the emergency was evident by the fact Appellant, who was hiding on the subject property beneath a bush, and his co-defendant, who was crouched in a nearby backyard, "were still at large." *See* Trial Court Opinion, filed 10/11/17, at 6. In response to Mr. Scott's statements, the police established a perimeter and apprehended both suspects.

Viewing the circumstances objectively, we find no evidence that Mr. Scott made his statements to Sergeant Anderson with the intent of creating evidence in furtherance of prosecution. *See Clark*, *supra* at 2175 (recognizing that "when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony" it is not testimonial in nature). Rather, Mr. Scott's statements were made with the purpose of assisting the police with an ongoing emergency and, thus, were non-testimonial in nature. Accordingly, we discern no violation of the

_____

[6] We will assume, *arguendo*, that Mr. Scott's statements were made, at least in part, in response to police questioning.

Confrontation Clause by the trial court's admission of Mr. Scott's statements at trial.[7]

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/27/18

---

[7] Although non-testimonial hearsay statements are exempted from Confrontational Clause scrutiny, such statements may still be excluded from evidence if they violate Pennsylvania's hearsay rules. *See Commonwealth v. Abrue*, 11 A.3d 484 (Pa.Super. 2010). Here, Appellant suggests in his brief that Sergeant Anderson improperly testified to Mr. Scott's out-of-court statements in violation of the hearsay rules. We find this issue to be waived since Appellant failed to raise it in his court-ordered Pa.R.A.P. 1925(b) statement. *See* Pa.R.A.P. 1925(b)(4)(vii). In any event, even if not waived, we conclude the trial court did not err in admitting the statements pursuant to the "excited utterance" exception to the hearsay rule. *See* Pa.R.E. 803(2) (setting forth that an "excited utterance" is "a statement relating to a startling event or condition"). The evidence reveals Mr. Scott, who was scared, screaming, and did not have the opportunity to speak to others, made his statements about being robbed at gunpoint to the police immediately upon their arrival at a time when Appellant was still in the backyard hiding under a bush. We agree with the trial court that this meets the "excited utterance" exception. *See id. See also Commonwealth v. Keys*, 814 A.2d 1256 (Pa.Super. 2003) (setting forth factors to consider in determining whether a statement is an excited utterance and noting the factors are to be considered in light of the surrounding circumstances).