J-S37027-14

2014 PA Super 249

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DONALD EARL WILLIAMS, JR. | |
| Appellant | No. 2016 MDA 2013 |

Appeal from the Judgment of Sentence entered September 20, 2013
In the Court of Common Pleas of Berks County
Criminal Division at No: CP-06-CR-0004165-2009

BEFORE: LAZARUS, STABILE, and MUSMANNO, JJ.

OPINION BY STABILE, J.:                                    **FILED OCTOBER 30, 2014**

Appellant, Donald Earl Williams, Jr., appeals from the trial court's September 20, 2013 judgment of sentence imposing life imprisonment and various concurrent and consecutive sentences for first-degree murder, rape, aggravated assault, two counts of arson, involuntary deviate sexual intercourse, indecent assault, and possessing an instrument of crime.[1]  We affirm.

A jury found Appellant guilty of the aforementioned offenses on September 18, 2013.  The trial court imposed life imprisonment for first-degree murder after the jury was unable to reach a unanimous verdict in the

---

[1]  18 Pa.C.S.A. §§ 2502(a), 3121(a)(1), 2702(a)(1), 3301(a)(1)(i-ii), 3123(a)(1), 3126(a)(2), 907(a).

penalty phase. ***See*** 42 Pa.C.S.A. § 9711(c)(1)(v).[2] The trial court denied Appellant's post-sentence motions on October 15, 2013. Appellant filed this timely appeal on November 12, 2013. He argues that the trial court erred in admitting into evidence statements the victim made to neighbors and first responders shortly after the crimes occurred. The victim died prior to trial, and Appellant argues admission of her statements violated his right to confront witnesses guaranteed by the Sixth Amendment to the United States Constitution.[3]

In assessing Appellant's pre-trial motion to exclude the victim's statements, the trial court made the following findings of fact:

1. On June 25, 2009, shortly after 11:00 a.m. Maria Serrano placed a telephone call to Berks County 9-1-1.

---

[2] "The court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment." 42 Pa.C.S.A. § 9711(c)(1)(v).

[3] The Sixth Amendment provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. CONST. amend. VI.

2. The telephone call was placed from 826 Lincoln Street in the City of Reading, Berks County, Pennsylvania.

3. During the 9-1-1 call, Maria Serrano stated that [Appellant], her ex-boyfriend, had burned her in her home at 82 Lincoln Street, and that she was currently at the next-door neighbor's house.

4. Ms. Serrano said that she was burned "all over the place," stated that she was bleeding, and also indicated that there was a fire.

5. Ms. Serrano indicated that [Appellant] poured gasoline and lighter fluid onto her and then ignited the mixture, causing burns to her face, hair, feet, and arms.

6. She further stated that she felt "sick," "horrible," and that she was going to pass out.

7. In addition, she stated that [Appellant] had subsequently fled the home.

8. Katia Lopez, who resided at 828 Lincoln Street, testified that at approximately 11:00 a.m. on June 25, 2009, Maria Serrano (hereinafter the "victim") came out of 824 Lincoln Street screaming.

9. Ms. Lopez stated that the resident of 826 Lincoln Street, whom she knew only as "Juana," took the victim into that residence.

10. The 800 block of Lincoln Street consists of a series of connected row homes. 824 Lincoln Street is located in the middle of the block with residential units connected on both sides.

11. Ms. Lopez testified that the victim was bleeding and screaming for help. She further stated that the victim was wearing "only a bra and a piece of a pair of pants or a skirt, whatever she had on the bottom."

12. Ms. Lopez also testified that the victim "was completely burned" and that she was "screaming frantically to please help her."

13.   While at 826 Lincoln Street, the victim told Ms. Lopez that "Don-Don" had stabbed her with a screwdriver in the middle of her forehead and to the side of her head.  Ms. Lopez observed wounds in that area of the victim's head.

14.   The victim further confided that "Don-Don" took her to the basement, hit her on the ribs, poured gasoline on her, and then set her on fire.

15.   Ms. Lopez knew "Don-Don" to be the victim's ex-boyfriend, whom she identified as [Appellant].

16.   Finally, Ms. Lopez testified that after medical personnel arrived, she stepped outside and observed [Appellant] standing on Douglass Street and looking toward Lincoln Street.

17.   Ms. Lopez began screaming to other people in the area about [Appellant], at which point he ran away from her location.

18.   Donald Hirsch, a paramedic working for the City of Reading Fire Department, was dispatched to 824 Lincoln Street at 11:14 a.m. on June 25, 2009 due to a reported fire.

19.   When Mr. Hirsch arrived, he observed that the victim was in pain and that she was screaming, "Help me."  Mr. Hirsch testified that he would describe her emotional state as "very, very, very upset" and that she asked him numerous times if she were going to die.

20.   On June 25, 2009, Officer Craig Hevalow of the Reading Police Department was also dispatched to 824 Lincoln Street due to a reported fire and domestic assault.

21.   Officer Hevalow observed that blood spatter covered the victim's body.  He also testified that the victim's legs were badly bruised, that her clothing was burned, and he described her as "high strung," "loud," and "in pain."

22.   Officer Hevalow engaged in a brief and abrupt conversation with the victim in order to obtain basic information.

23.   The only question Officer Hevalow asked the victim was "What happened?"

24. The victim, who was being attended to by medical personnel, told Officer Hevalow that [Appellant] entered her home, poured gasoline on her, set her on fire, and tried to kill her.

25. Officer Brian Burr, who had also been dispatched to the scene, described the victim's demeanor as "frantic," and observed burns on the victim's clothes, skin, and hair.

26. Officer Burr learned from the victim that [Appellant] resided at ADAPPT, a halfway house located in Reading, Pennsylvania.

27. While carrying the victim from 826 Lincoln Street to the ambulance, paramedic Donald Hirsch was stopped by the Fire Chief, who asked where the victim was located when she was set on fire.

28. After arriving at the ambulance Donald Hirsch and his partner continued to treat the victim. The victim's hair was singed and her upper body, which appeared to have first-degree burns, had a large amount of soot on it.

29. The victim had first and second-degree burns on her lower back, lower abdomen, and feet. Some of her skin was "sloughing off" because of the burns. Her inner thighs and buttocks appeared to be the most badly burned area of her body, and Hirsch classified those burns as second-degree burns. The victim's clothing had melted to her inner thighs and buttocks. She also had a laceration on the bridge of her nose that was bleeding.

30. The victim repeatedly kept asking Hirsch if she were going to die. Hirsch initially tried to deflect the questions; but when the victim continued to ask him if she were going to die, he replied that death was a possibility because "burns like she has can be life-threatening." Hirsch also told her that he would do the best he could to prevent her from dying.

31. In order to determine the extent of the victim's injuries, Hirsch asked her what had happened. The victim told him that she was taking a shower when a man broke into the house and subsequently pulled her out of the shower. She stated that the man punched her multiple times in the

stomach, ribs, and face. She was then forced to engage in oral and vaginal sex with the man.

32. The victim then told Hirsch that following the sexual assault, the man forced her to get back into the shower. After that, he forced her to go downstairs into the basement, where he poured gasoline on her and lit her on fire.

33. Hirsch also recalled the victim stating that her assailant's first name was Donald.

[. . .]

39. Todd Iager, the Fire Marshall for the City of Reading, is an expert in the field of fire investigations.

40. When Fire Marshall Iager arrived at the scene on June 25, 2009, the victim was being carried to the ambulance and a fire was still actively burning at 824 Lincoln Street.

41. Fire Marshall Iager, who spoke to the victim in the presence of paramedics Hirsch and Bauer, described her demeanor as "exceptionally emotional."

42. The victim conveyed to Fire Marshall Iager that her ex-boyfriend [Appellant] entered her home armed with a screwdriver. She stated that [Appellant] physically accosted her and then took her to the basement and began speaking about her "judgment day." [Appellant] next forced her to perform oral sex on him.

43. The victim then told Fire Marshall Iager that [Appellant] poured gasoline on her and that as she was trying to get up off the ground, she saw [Appellant] use a cigarette lighter to ignite her.

44. While speaking to Fire Marshall Iager, the victim continually and frequently asked him if she were going to die.

45. Fire Marshall Iager told her that everything would be okay and to hang in there, be strong and listen to what the paramedics were telling her.

46. The victim did not calm down after hearing this and continued to ask Fire Marshall if she were going to die.

47. Fire Marshall Iager then assessed the fire damage to 824 Lincoln Street. He determined the origin of the fire to be in the basement near the bottom of the stairwell and on the victim's body.

[. . .]

54. The victim was taken by ambulance to the Car Tech Helipad so that she could be transported by helicopter to the Lehigh Valley Hospital.

55. Upon arrival at the hospital, vaginal swabs were taken of the victim in accordance with the performance of a rape kit.

56. Subsequent DNA analysis indicated a statistical probability that the spermatozoa found inside the victim belonged to [Appellant].

57. The victim was intubated and placed into a medically-induced coma from which she never awoke. She was pronounced dead on August 8, 2009.

Trial Court Findings of Fact, 4/18/11, at ¶¶ 1-33, 39-47, 54-57 (record citations omitted).

Appellant argues the trial court violated his confrontation clause rights by admitting into evidence the testimony of police officers Brian Burr ("Burr") and Craig Hevalow ("Hevalow"), Fire Marshall Todd Iager ("Iager"), the transcript and recording of Maria Serrano's ("Serrano") 9-1-1 call, the testimony of paramedic Donald Hirsch ("Hirsch") and the testimony of Katia Lopez ("Lopez"). Appellant's assertion of a Confrontation Clause violation presents an issue of law. Our scope of review is plenary and our standard of

review is *de novo*. ***Commonwealth v. Abrue***, 11 A.3d 484, 487 (Pa. Super. 2010), *appeal denied*, 21 A.3d 1189 (Pa. 2011).

In support of his argument, Appellant relies on a trilogy of United States Supreme Court cases: ***Crawford v. Washington***, 541 U.S. 36 (2004), ***Davis v. Washington***, 547 U.S. 813 (2006), and ***Michigan v. Bryant***, 131 S. Ct. 1143 (2011). Appellant argues Serrano's various statements were testimonial and therefore inadmissible at trial because Appellant never had the opportunity to cross-examine her.

In ***Crawford***, the trial court admitted the tape-recorded statement of a wife implicating her husband as the perpetrator in a stabbing. ***Crawford***, 541 U.S. at 38. The wife was unavailable at trial because the husband objected to her testimony on marital privilege grounds. ***Id.*** at 40. Washington state law did not prohibit introduction of the wife's tape-recorded statement so long as it bore "adequate indicia of reliability." ***Id.*** The Washington Supreme Court ultimately concluded the wife's statement bore sufficient indicia of reliability to warrant its admission at trial. ***Id.*** at 41. The husband argued the wife's statement violated his rights under the Confrontation Clause, regardless of its admissibility under state law. ***Id.***

The United States Supreme Court held the wife's statement inadmissible under the Confrontation clause. "[T]he principle evil at which the Confrontation Clause was directed was the civil-law mode of procedure, and particularly its use of *ex parte* communications as evidence against the

accused." *Id.* at 50. Likewise, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Id.* at 53. The *Crawford* Court found no occasion to offer a "comprehensive definition of 'testimonial[.]'" *Id.* at 68. "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The wife's tape-recorded police interrogation was testimonial and therefore plainly inadmissible under the *Crawford* analysis. *Id.* at 68-69.

The *Davis* Court considered companion cases (*Davis v. Washington* and *Hammon v. Indiana*[4]), one of which involved admission of a victim's statement to a 911 operator. *Davis*, 547 U.S. at 817-18. The victim described an ongoing domestic disturbance. *Id.* When the victim told the operator her assailant ran out the door, the operator instructed the victim to stay on the line and answer questions. *Id.* at 818. Thereafter, the operator gathered more information about the perpetrator and the circumstances of the assault. *Id.* Within four minutes of the 911 call, police arrived to find the victim "shaken" and "frantic." *Id.* The trial court admitted a recording

_____

[4] The analysis of *Hammon* also appears at 547 U.S. 813.

of the 911 call into evidence over the defendant's Confrontation Clause objection. *Id.* at 819.

In *Hammon*, two police officers traveled to the site of a domestic disturbance and interviewed the wife after the disturbance was over. *Id.* at 819-20. The victim filled out and signed a battery affidavit while the defendant was detained in a separate room. *Id.* The victim did not testify at trial, but the police officer testified about the contents of the victim's interview and authenticated the affidavit. *Id.* at 820.

In considering these two cases, the *Davis* Court distinguished testimonial and nontestimonial hearsay:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. The Supreme Court confirmed that the protection of the Confrontation Clause attaches only to testimonial hearsay. *Id.* at 823-25.

Concerning the 911 call in *Davis*, the Supreme Court noted that 911 operators are not law enforcement officers, but they may be "agents of law enforcement when the conduct interrogations of 911 callers." *Id.* at 823 n.2. "For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police." *Id.* "The question before us [...] then, is whether, objectively considered, the interrogation that took

- 10 -

place in the course of the 911 call produced testimonial statements." *Id.* at 826.

In answering that question, the Court noted the victim was describing events as they were happening, rather than rendering an account of past events. *Id.* at 827. The 911 call was "plainly a call for help against a bona fide physical threat. The operator's follow up questions "were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in ***Crawford***) what happened in the past." *Id.* "That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." *Id.* Likewise, the informality of the 911 call – the victim provided frantic answers via telephone from a potentially unsafe environment – evinced the nontestimonial nature of the victim's statements. *Id.*

By way of contrast, the victims' interview in ***Hammon*** took place several hours after the domestic disturbance, and the victim gave a formal, tape-recorded interview while the assailant was detained in another room. *Id.* The Court concluded the primary purpose of 911 call in ***Davis*** "was to enable police assistance to meet an ongoing emergency." *Id.* The interview in ***Hammon***, on the other hand, was clearly an investigation into a past event. *Id.* at 830.

Finally, in **Bryant**, 131 S. Ct. at 1150, police found the victim dying of a gunshot wound. They asked him "what had happened, who had shot him, and where the shooting had occurred." **Id.** The victim identified the defendant by first name and explained that the defendant shot him through the back door of the defendant's house. **Id.** The victim died within several hours of his conversation with police. **Id.** The **Bryant** Court summarized the issue as follows:

> We now face a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim. Thus, we confront for the first time circumstances in which the 'ongoing emergency' discussed in **Davis** extends beyond an individual victim to a potential threat to the responding police and the public at large.

**Id.** at 1156.

The Court also explained the objective nature of the 'primary purpose' inquiry: "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." **Id.** The existence of an ongoing emergency is important because it indicates that the declarant's purpose in speaking was to help resolve a dangerous situation rather than prove past events. **Id.** at 1157. The "zone of potential victims" and the type of weapon involved inform the inquiry. **Id.** at 1158. The **Bryant** Court opined that domestic violence

cases, such as those at issue in *Davis*, often have a narrower zone of potential victims. *Id.*

In a passage highly relevant to the matter on appeal, the *Bryant* Court discussed the relevance of the victim's medical condition.

> The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one. The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.

*Id.*

Finally, the *Bryant* Court explained that the statements of both parties are relevant to determining a conversation's primary purpose. *Id.* at 1160-61. The Court recognized that police serve as first responders and as investigators and therefore can have mixed motives. *Id.* at 161. Likewise, an injured victim could have mixed motives in making a statement to a police officer. *Id.* The nature and severity of the victim's injuries are relevant to the victim's purpose in making his or her statements. *Id.* In summary, "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." *Id.* at 115.

The *Bryant* Court held that the facts before it presented an ongoing emergency because "an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [the victim] within a few

blocks and a few minutes of the location where the police found [him]." *Id.* at 1164. The victim made the statements introduced at trial within minutes of his encounter with police and before they had secured the scene. *Id.* at 1165. The victim was in pain and repeatedly asked when paramedics would arrive. *Id.* The Court therefore did not believe the victim had a primary purpose of establishing events relevant to a criminal prosecution. *Id.* The questions from the police officers simply allowed them to "assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public." *Id.* at 1166. The encounter between the victim and the police lacked formality, and was "similar, though not identical, to the informal, harried 911 call in *Davis* than to the structured, station-house interview in *Crawford*." *Id.* at 1166. The Court therefore concluded the victim's statements were nontestimonial and their admission at the defendant's trial did not violate his Confrontation Clause rights. *Id.* at 1167.

Instantly, the Commonwealth offered Serrano's hearsay statements through several sources, including a recording of her 911 phone call and the testimony of neighbors, police officers, and paramedics. We will begin by reviewing the 911 recording, as similar evidence was directly at issue in *Davis*. At the beginning of the phone call, Serrano informs a Berks County 911 operator that her ex-boyfriend, Donald Williams, burned her. Commonwealth's Exhibit 66. Serrano also informs the operator that her house is on fire. *Id.* Serrano's voice is frantic, her breathing is labored, and

she repeatedly states that she is burned all over and needs help. *Id.* Several times, Serrano states that she feels ready to pass out. *Id.* The operator asks what Williams burned her with, and Serrano states that he used gasoline and lighter fluid to start a fire. *Id.* The operator asks where Williams is, and Serrano states that he ran out of the house. *Id.*

After a short conversation (the run time on the compact disc is two minute and fifty seconds), the Berks Count operator transfers Serrano to the Reading City police department. Serrano immediately informs the Reading City operator that her house is on fire and that Appellant, her ex-boyfriend, burned her. Commonwealth's Exhibit 67. The Reading City operator asks what happened, and Serrano states that her ex-boyfriend came in when she was in the shower, forced her to "make love" to him, hit her, and attacked her with a screwdriver. *Id.* The operator asks where Appellant is and if he is armed. *Id.* Serrano states that she does not think Appellant is armed and that he fled the house. *Id.* She also identifies the halfway house where Appellant had been living. *Id.* Serrano's conversation with the Reading City operator lasted one minute and twelve seconds. *Id.*

Appellant argues that these facts present a domestic violence case in which Appellant posed no further threat to Serrano. According to Appellant no ongoing emergency existed during Serrano's 911 call (or any other statements she made to first responders). Since Serrano was out of her

burning house and called 911 from a neighbor's home, Appellant asserts the fire posed no further threat to her.

We believe Appellant construes "ongoing emergency," as that phrase is used in *Davis* and *Bryant*, too narrowly. We are cognizant that in *Davis*, the victim called while the assault was ongoing. *Davis*, 547 U.S. at 817-18. The *Davis* Court noted that an initially nontestimonial conversation could change into a testimonial one depending upon the circumstances. *Id.* at 828-29. The *Davis* Court also noted that it was asked to analyze only the victim's statements identifying her assailant. *Id.* at 829.

In the case on appeal, Appellant was not in Serrano's immediate presence during the 911 conversation. Nonetheless, we believe other factors present here but absent in *Davis* indicate an ongoing emergency. For instance, Serrano was severely and mortally wounded at the time of the 911 call. *See Bryant*, 131 S. Ct. at 1159 ("*Davis* and *Hammon* did not present medical emergencies, despite some injuries to the victims."). The record indicates that she sustained first and second degree burns over 49 percent of her body, and a Commonwealth expert testified that Serrano had only a 2 percent chance of survival. N.T., 9/11-13/2013, at 280. Serrano repeatedly and frantically pled for help during the 911 call, and repeatedly stated she felt ready to pass out. Serrano's demeanor, her repeated pleas for immediate help, and her severe injuries plainly indicate the presence of an ongoing emergency.

In addition, Serrano's account of the fire's origin was necessary to aid firefighters in containing the fire. Serrano lived in a row house with adjoining homes on either side, and the zone of potential victims of Appellant's arson therefore included Serrano's neighbors. We are cognizant of the *Bryant* Court's statement that the zone of potential victims is normally smaller in a domestic violence case than in a case that involves a threat to the general public. *Bryant*, 131 S. Ct. at 1158. In relying on that point here, Appellant focuses on his physical and sexual assault of Serrano but ignores the ongoing row house fire. The *Bryant* Court noted that the "duration and scope of an emergency may depend in part on the type of weapon employed." *Id.* at 1158. Here, Appellant used gasoline and lighter fluid to start a fire in a row house. This posed risks to Serrano's neighbors, and we believe her account of the fire's location and means of origin pertained to an ongoing emergency.

The *Bryant* Court considered an ongoing emergency "among the most important circumstances informing the 'primary purpose' of an interrogation." *Id.* at 1157. Thus, the ongoing emergency in this case is highly indicative of Serrano's primary purpose in making her statements. In addition, Serrano's conversation with the 911 operators was highly informal. Serrano was in severe pain, frantic, and repeatedly asking for help. Neither operator engaged in any formal questioning, nor could they, given Serrano's

circumstances. Both operators asked how the fire started, which garnered information necessary to help firefighters do their job.

Next we consider Serrano's account of the sexual assault. Serrano did not offer an account of the sexual assault until more than three minutes into the 911 call, after the Berks County operator transferred her to Reading City police. Even so, we are not persuaded that the primary purpose of the conversation changed at that point. Prior to Serrano's account of the rape, the Reading City operator simply asked, "what happened?" The Reading City operator's questioning was less detailed than that at issue in **Bryant**: "[t]he police asked him 'what had happened, who had shot him, and where the shooting had occurred.'" **Id.** at 1150, 1163. The **Bryant** Court assessed the victim's answers as follows:

> When he made the statements, [the victim] was lying in a gas station parking lot bleeding from a mortal gunshot wound to his abdomen. His answers to the police officers' questions were punctuated with questions about when emergency medical services would arrive. He was obviously in considerable pain and had difficulty breathing and talking. From this description of his condition and report of his statements, we cannot say that a person in [the victim's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.'

**Id.** at 1165. Here, Serrano suffered mortal burn wounds and was at her neighbor's house, but the circumstances are otherwise identical to those of **Bryant**. Further, simply asking a victim "what happened" allows the police to assess the nature of the threat posed by the perpetrator. **Id.** at 1166; **see also Davis**, 547 U.S. at 827. Without Serrano's account of Appellant's

- 18 -

identity and the nature of the assault, law enforcement would be unaware of whether Appellant knew Serrano or committed a random act of violence.

For all of the foregoing reasons, we conclude the primary purpose of Serrano's statements during the 911 call was to seek medical assistance and assist first responders in addressing an ongoing emergency. Her statements were not testimonial, and their admission at trial did not violate Appellant's rights under the Confrontation Clause.

Appellant also challenges the trial court's admission of his statements to paramedic Hirsch. Serrano's statement to Hirsch included additional details of the sexual assault not included in the 911 recordings. Specifically, Hirsh testified that Serrano told him Appellant forced her to perform oral and vaginal intercourse. N.T., 9/11-13/13, at 123. After Hirsch got Serrano into the back of an ambulance, he asked her "what happened." Hirsh did so because he "needed to know exactly what kind of injuries I am looking for beyond what I, you know, externally saw." **Id.** Appellant concedes that Serrano's statements to assist Hirsh in assessing the medical emergency are non-testimonial. Appellant's Brief at 33. He argues that the trial court should have refused to permit Hirsh to testify to facts not necessary to his assessment of the medical emergency. **Id.** Given Appellant's concession, we need not address Hirsch's testimony any further.

The remainder of Hirsch's testimony, as well as that of Iager, Hevalow, Burr, and Lopez, is simply cumulative of statements we have already

- 19 -

determined to be nontestimonial. That is, all of the remaining statements relate to Appellant's identity as the perpetrator, the nature of the physical and sexual assault, and the means and point of origin of the fire. All of these facts were established through Serrano's nontestimonial statements to the 911 operators and to Hirsch. As such, any error[5] in the trial court's admission of the remaining statements was harmless. *Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012).

Finally, we address the Commonwealth's argument that Serrano's statements were admissible as dying declarations. *See* Pa.R.E. 804(b)(2). In *Crawford*, the Court noted that dying declarations were historically admitted against criminal defendants regardless of whether they were testimonial:

> Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.

*Crawford*, 541 U.S. at 55 n.6 (citation omitted) (emphasis added). The parties argued the applicability of dying declaration in *Bryant*, but abandoned that issue before it rose to the United States Supreme Court.

> In [*Crawford*], this Court noted that, in the law we inherited from England, there was a well-established exception to the confrontation requirement: The cloak protecting the

---

[5] We do not decide whether the trial court erred.

- 20 -

accused against admission of out-of-court testimonial statements was removed for dying declarations. This historic exception, we recalled in **Giles v. California**, 554 U.S. 353, 358, [. . .] applied to statements made by a person about to die and aware that death was imminent. Were the issue properly tendered here, I would take up the question whether the exception for dying declarations survives our recent Confrontation Clause decisions. The Michigan Supreme Court, however, held, as a matter of state law, that the prosecutor had abandoned the issue. The matter, therefore, is not one the Court can address in this case.

**Bryant**, 131 S. Ct. at 1177 (Ginsburg, J. dissenting).

In a case with facts strikingly similar to those before us, the Pennsylvania Supreme Court treated the victim's statements as an admissible dying declaration. **Commonwealth v. Stickle**, 398 A.2d 957 (Pa. 1979). That case, however, predates **Crawford** and contains no analysis of the substance of the victim's statements and no analysis of their admissibility under the Confrontation Clause.

In summary, a dying declaration was admissible at common law against an accused without regard the accused's right to confront his accusers. It is unclear whether that rule survives after **Crawford** and its progeny. The **Crawford** majority ("**If** this exception must be accepted on historical grounds . . ." **Crawford**, 541 U.S. at 55 n.6 (emphasis added)) and Justice Ginsberg's dissent in **Bryant** treat the question as an open one. In other words, it is not clear whether a trial court can admit a testimonial dying declaration into evidence without violating an accused's Confrontation

Clause rights. We need not attempt to answer that question here, as we have concluded Serrano's statements were not testimonial.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/30/2014