J-S30035-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DOUGLAS MOODY | |
| Appellant | No. 1799 EDA 2014 |

Appeal from the Judgment of Sentence November 22, 2011
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010967-2009

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED JUNE 16, 2015**

Douglas Moody files this direct appeal from his aggregate judgment of sentence of 2-10 years' imprisonment for criminal trespass[1] and criminal mischief.[2] We affirm.

A brief procedural history is in order. Following a bench trial on July 6, 2011, the trial court found Moody guilty of both aforementioned charges. On November 22, 2011, the court imposed sentence. Moody did not file a direct appeal, but he filed a timely *pro se* petition under the Post Conviction Relief Act ("PCRA")[3] seeking reinstatement of his appellate rights *nunc pro*

_____

[1] 18 Pa.C.S. § 3502.

[2] 18 Pa.C.S. § 3304.

[3] 42 Pa.C.S. § 9541 *et seq.*

*tunc*.  On March 7, 2014, through counsel, Moody filed an amended PCRA petition alleging that trial counsel, now deceased, failed to file a direct appeal despite Moody's requests.  The docket provides that on May 29, 2014, the trial court entered an order restoring Moody's appellate rights *nunc pro tunc* and granting him thirty days within which to appeal.[4]  On June 19, 2014, Moody timely filed a notice of appeal.  Both Moody and the trial court have complied with Pa.R.A.P. 1925.

Moody raises three questions in this appeal:

> Did the trial court err in not finding the evidence was insufficient to show as a matter of law that [Moody] was guilty of criminal trespass where the testimony was based solely upon hearsay, [where the] statements were the only evidence provided showing that [Moody's] presence was not welcome?
>
> Did the trial court err in allowing the statements of complainant, Latasha Rosas, as it consisted of impermissible hearsay?
>
> Did the trial court err in allowing the statements of complainant, Salvatore Gutierrez, as it denied [Moody] the right to confrontation, protected under the Sixth Amendment of the United States Constitution and the Pennsylvania Constitution?

Brief For Appellant, p. 5.

---

[4] Although the order itself is not in the certified record, the docket provides the text of the order and date of entry, and the Commonwealth concedes that the trial court entered the order.  Brief For Appellee, p. 4 n. 1. Therefore, the absence of the order from the record does not impede appellate review.

Moody first challenges the sufficiency of the evidence of criminal trespass.[5] Our standard of review for such challenges is well-settled:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 716 (Pa.Super.2015).

The trial court's opinion recounts the evidence adduced during trial:

> Philadelphia Police Officer, Joseph Innamorato, testified that on June 1, 2009, at approximately 8:30 p.m., he and his partner, Officer Borith Long, received a radio call of a burglary in progress at 2244 Catherine Street in the City of Philadelphia. On arriving approximately two minutes later he was directed to the kitchen by the complainants, Ms. Latisha Rosas and Mr. Salvatore Gutierrez, both of whom he described as 'very frantic, distraught and scared.' On entering the kitchen he observed [Moody] lying unconscious on the floor,

_____

[5] Moody does not challenge the sufficiency of the evidence underlying his conviction for criminal mischief.

- 3 -

approximately five feet away from a broken window, bleeding from his head and hands. In addition, on examining the window he observed a trail of blood leading from the window sill to [Moody]. He described Mr. Gutierrez's speech as being very rapid and 'more emotional and had more scared, scaredness to it.' He also described Mr. Gutierrez's breathing as labored and very rapid.

Philadelphia Police Officer, Borith Long, testified that on June 1, 2009 at approximately 8:30 p.m. he and his partner received a radio call directing them to 2244 Catherine Street and arrived within two minutes of receiving the call. He testified that on entering the home, he observed [Moody] lying unconscious on the kitchen floor. He also testified that, on entering, Mr. Gutierrez kept repeating in broken English, 'He just kept saying that the guy came into my house, he broke my window. He kept saying that. He kept saying he coming into my house and he broke my window.' Officer Long described Mr. Gutierrez as having a red face and looking upset. He also described him as sweating, breathing hard and appearing angry. He also described Ms. Rosas as being 'scared and shaking' and speaking in Spanish.

Philadelphia Police Officer, James Battista, testified that on June 1, 2009, he arrived at 2244 Catherine Street at approximately 8:30 p.m., after Officer Innamorato had arrived. On entering the house he observed [Moody] lying unconscious on the floor between the living and dining rooms with blood on his hands. He also observed that the rear window was broken and the presence of blood on the sill. Officer Battista observed that [Moody] wasn't wearing shoes. On investigating the rear of the property, he discovered a brown boot in a common alleyway behind the house. Tracing the boot tracks he came upon a pickup truck, parked at an odd angle with the hood up, in which he observed another brown boot. On checking the vehicle registration of the truck, he discovered the truck was registered in the name of Fareed Hasan, the same name and

address as that listed on the Pennsylvania photo ID he had removed from [Moody]'s pocket.

At [Moody's] preliminary hearing held on August 18, 2009, before the Honorable Craig M. Washington, Ms. Latisha Rosas testified that on June 1, 2009, she was in her kitchen when at approximately 8:30 p.m.:

> 'I was cooking in the kitchen when I heard a noise on the backside of the house as though somebody was breaking some wood. At that moment I didn't pay much attention to it. Suddenly I heard a noise that was even stronger. So then I got near the window. So then I saw that this person was already inside the patio. He went directly to the window that's in the living room and started breaking it. I got scared and I started to yell. I started to yell for my husband who was asleep. He did not hear me. At that moment, I went to his room and woke him up. He woke up, asked me what's happening. I told him there was a person that was breaking the glass. He woke up and looked at the person. At that time we didn't know what to do. So then he went outside, he went to the next-door neighbor to ask for help … The neighbor next-door was not there, they didn't answer. At that moment, a car was going by and I stopped it. There were two ladies in it. I asked them if they could please call the police. The police arrived. The police came in. We came in with them. And at that time the person who's here was laying down on the kitchen floor.'

When asked if she had given Defendant permission to come into her home, she responded, 'No, I have never seen him before.' She also testified that the broken window was the only damage done to her house.

Pa.R.A.P. 1925(a) Opinion, pp. 3-6 (citations to trial transcript omitted).

The criminal trespass statute provides in relevant part: "A person commits an offense if, knowing that he is not licensed or privileged to do so, he: ... breaks into any building or occupied structure or separately secured or occupied portion thereof." 18 Pa.C.S. § 3503(a)(1)(ii). "Breaks into" is defined as "to gain entry by force, breaking, intimidation, unauthorized opening of locks, or through an opening not designed for human access." 18 Pa.C.S. § 3503(a)(3). Viewed in the light most favorable to the Commonwealth, the evidence establishes each element of criminal trespass beyond a reasonable doubt. The trial court correctly reasoned:

> The testimony of the three police officers, who arrived within minutes of receiving the call, that they observed [Moody] lying unconscious on the kitchen floor leaves little doubt that he had entered the premises. The testimony of Officer Innamorato that he observed a broken window with a trail of blood leading to [Moody] was sufficient to establish that [Moody] forced his way into the premises through the broken window. The testimony of Officer Battista that he recovered a brown boot in a common alleyway behind the house and another in a truck registered in a name matching that on the ID he recovered from [Moody]'s person further supports the conclusion that [Moody]'s means of entry was through the broken window. Finally, the testimony of all three officers that the complainants appeared to be in a highly agitated state when they arrived was sufficient to establish that [Moody]'s entry was unauthorized. The conclusion that [Moody]'s entry was neither licensed nor privileged is further supported by Ms. Rosas's testimony that she had never seen him before.

Pa.R.A.P. 1925(a) Opinion, p. 8.

In his second argument, Moody contends that the trial court erred by admitting the preliminary hearing testimony of Latisha Rosas when she failed to appear as a Commonwealth witness during trial. The Commonwealth established at trial that Rosas was unavailable to testify despite the Commonwealth's good faith attempts to find her. Thus, the trial court acted within its discretion by admitting Rosas' preliminary hearing testimony into evidence.

Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. **Commonwealth v. Bronshtein**, 691 A.2d 907, 916 (Pa.1997). An unavailable witness's prior recorded testimony is admissible and will not offend the defendant's right of confrontation if the Commonwealth made good faith efforts to locate the witness, and the defense had a full and fair opportunity to cross-examine that witness at the earlier proceeding.[6] Pa.R.E. 804(b)(1); **Commonwealth v. Bazemore**, 614 A.2d 684, 685 (Pa.1992).

To meet its burden of demonstrating a witness's unavailability, the Commonwealth is not required to establish that she "has disappeared from the face of the earth," only that the prosecution made a "good faith effort"

_____

[6] Moody does not argue in this appeal that he lacked a full and fair opportunity to cross-examine Rosas during his preliminary hearing. Accordingly, we will not discuss this subject below.

to find her yet failed to do so. ***Commonwealth v. Blair***, 331 A.2d 213, 215 (Pa.1975). It is within the trial court's discretion to determine what constitutes a good faith effort, and we will not overturn its decision absent an abuse of that discretion. ***Commonwealth v. Douglas***, 737 A.2d 1188, 1196 (Pa.1999).

Here, neither complainant appeared during trial despite the Commonwealth's efforts to serve them with subpoenas. Officer Rosario testified with regard to the Commonwealth's efforts to locate Rosas and serve her with a trial subpoena. N.T., 7/6/11, pp. 4-13. Officer Rosario reviewed Rosas' biographical information to determine her address and mailed subpoenas to two possible addresses for Rosas and her husband. ***Id***. at 5-6. After the subpoenas returned to Officer Rosario unserved, she attempted personal service by visiting each address on two different dates at different times of day. ***Id***. at 8-9. On both occasions, she tried to speak with next-door neighbors, who did not respond. ***Id***. She also reviewed the JNET database, which provides information regarding addresses of individuals who receive welfare. ***Id***. at 7. Closer to trial, she surveyed local, state, and federal prisons using the PARS database to confirm that Rosas was not in custody. ***Id***. She further contacted numerous local hospitals and the medical examiner's office without finding any trace of the witness. ***Id***., pp. 7-8.

The trial court acted within its discretion by concluding that Officer Rosario made a good faith effort to locate Rosas. Officer Rosario exerted considerable effort to find Rosas through a variety of means. Merely because Officer Rosario might have taken other measures – such as checking whether Rosas was on vacation or in the custody of immigration officials - does not nullify the efforts that she made. **See Commonwealth v. Douglas**, 737 A.2d 1188, 1196 (Pa.1999) (police made good faith effort to find witness, including attempt to find him at multiple addresses; lack of additional surveillance did not negate good faith effort actually undertaken);[7] **Commonwealth v. Wayne**, 720 A.2d 456, 467 (Pa.1998) (police made good faith effort to locate witness, even though they did not begin search until four days prior to trial, where they visited his last known address as well as addresses on driver's license and car registration and asked family members about his whereabouts; "the Commonwealth is held to making a reasonable effort to secure the witness's presence, not to being omniscient regarding the potential for a witness to leave the jurisdiction").

Lastly, Moody asserts that the trial court violated his Confrontation Clause rights by admitting Officer Long's testimony into evidence concerning Gutierrez's statements to police officers who were responding to the break-

---

[7] While certain portions of the Supreme Court's opinion in **Douglas** did not command a majority of the Court, five of the seven justices joined in the portion of the opinion approving the trial court's decision to declare a missing witness unavailable for trial.

in.  Gutierrez, as noted above, was not available for trial.  Officer Long testified that Gutierrez repeatedly stated to the responding officers that Moody "came into my house" and "broke my window".  Moody contends that these statements were "testimonial" in nature and therefore inadmissible under **Crawford v. Washington**, 541 U.S. 36 (2004).  We disagree.

Moody's assertion of a Confrontation Clause violation presents an issue of law.  Our scope of review is plenary, and our standard of review is *de novo.*  **Commonwealth v. Abrue**, 11 A.3d 484, 487 (Pa.Super.2010), *appeal denied,* 21 A.3d 1189 (Pa.2011).

In **Commonwealth v. Williams**, 103 A.3d 354 (Pa.Super.2014), Judge Stabile analyzed when statements are "testimonial" under the Confrontation Clause by discussing three recent United States Supreme Court decisions: **Crawford**, **Davis v. Washington**, 547 U.S. 813 (2006), and **Michigan v. Bryant**, 562 U.S. 344 (2011).  We can do no better than to recite Judge Stabile's thorough discussion:

> In **Crawford**, the trial court admitted the tape-recorded statement of a wife implicating her husband as the perpetrator in a stabbing.  **Crawford**, 541 U.S. at 38 [].  The wife was unavailable at trial because the husband objected to her testimony on marital privilege grounds.  **Id.** at 40 []. Washington state law did not prohibit introduction of the wife's tape-recorded statement so long as it bore 'adequate indicia of reliability.'  **Id.**  The Washington Supreme Court ultimately concluded the wife's statement bore sufficient indicia of reliability to warrant its admission at trial.  **Id.** at 41 []. The husband argued the wife's statement violated his rights under the Confrontation

- 10 -

Clause, regardless of its admissibility under state law. *Id.*

The United States Supreme Court held the wife's statement inadmissible under the Confrontation clause. '[T]he princip[al] evil at which the Confrontation Clause was directed was the civil-law mode of procedure, and particularly its use of *ex parte* communications as evidence against the accused.' *Id.* at 50 []. Likewise, 'the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination.' *Id.* at 53 []. The **Crawford** Court found no occasion to offer a 'comprehensive definition of "testimonial[.]" ' *Id.* at 68 []. 'Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.' *Id.* The wife's tape-recorded police interrogation was testimonial and therefore plainly inadmissible under the **Crawford** analysis. *Id.* at 68–69 [].

**Davis** [consisted of two] companion cases (**Davis v. Washington** and **Hammond v. Indiana**)[,] one of which involved admission of a victim's statement to a 911 operator. **Davis***,* 547 U.S. at 817–18 []. The victim described an ongoing domestic disturbance. *Id.* When the victim told the operator her assailant ran out the door, the operator instructed the victim to stay on the line and answer questions. *Id.* at 818 []. Thereafter, the operator gathered more information about the perpetrator and the circumstances of the assault. *Id.* Within four minutes of the 911 call, police arrived to find the victim 'shaken' and 'frantic.' *Id.* The trial court admitted a recording of the 911 call into evidence over the defendant's Confrontation Clause objection. *Id.* at 819 [].

In **Hammon***,* two police officers traveled to the site of a domestic disturbance and interviewed the wife

after the disturbance was over. *Id.* at 819–20 []. The victim filled out and signed a battery affidavit while the defendant was detained in a separate room. *Id.* The victim did not testify at trial, but the police officer testified about the contents of the victim's interview and authenticated the affidavit. *Id.* at 820 [].

In considering these two cases, the *Davis* Court distinguished testimonial and nontestimonial hearsay:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822 []. The Supreme Court confirmed that the protection of the Confrontation Clause attaches only to testimonial hearsay. *Id.* at 823–25 [].

Concerning the 911 call in *Davis,* the Supreme Court noted that 911 operators are not law enforcement officers, but they may be 'agents of law enforcement when they conduct interrogations of 911 callers.' *Id.* at 823 n. 2 []. 'For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police.' *Id.* 'The question before us [...] then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements.' *Id.* at 826.

In answering that question, the Court noted the victim was describing events as they were happening, rather than rendering an account of past events. *Id.* at 827 []. The 911 call was 'plainly a call for help against a *bona fide* physical threat.' The

- 12 -

operator's follow up questions 'were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in **Crawford**) what happened in the past.' **Id**. 'That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon.' **Id**. Likewise, the informality of the 911 call — the victim provided frantic answers via telephone from a potentially unsafe environment — evinced the nontestimonial nature of the victim's statements. **Id**.

By way of contrast, the victim's interview in **Hammon** took place several hours after the domestic disturbance, and the victim gave a formal, tape-recorded interview while the assailant was detained in another room. **Id**. The Court concluded the primary purpose of 911 call in **Davis** 'was to enable police assistance to meet an ongoing emergency.' **Id**. The interview in **Hammon,** on the other hand, was clearly an investigation into a past event. **Id**. at 830 [].

Finally, in **Bryant**, 131 S.Ct. at 1150, police found the victim dying of a gunshot wound. They asked him 'what had happened, who had shot him, and where the shooting had occurred.' **Id**. The victim identified the defendant by first name and explained that the defendant shot him through the back door of the defendant's house. **Id**. The victim died within several hours of his conversation with police. **Id**. The **Bryant** Court summarized the issue as follows:

> We now face a new context: a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim. Thus, we confront for the first time circumstances in which the 'ongoing emergency' discussed in **Davis** extends beyond an individual victim to a potential threat to the responding police and the public at large.

> *Id.* at 1156.

> The Court also explained the objective nature of the 'primary purpose' inquiry: 'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.' *Id.* The existence of an ongoing emergency is important because it indicates that the declarant's purpose in speaking was to help resolve a dangerous situation rather than prove past events. *Id.* at 1157. The 'zone of potential victims' and the type of weapon involved inform the inquiry. *Id.* at 1158. The **Bryant** Court opined that domestic violence cases, such as those at issue in **Davis**, often have a narrower zone of potential victims. *Id.*

*Wlliams*, 103 A.3d at 358-60.

Furthermore, in assessing the primary purpose of an "interrogation", the court must "objectively evaluate the circumstances surrounding the interrogation, including the formality and location, and the statements and actions of both the interrogator and the declarant." *Commonwealth v. Allshouse*, 36 A.3d 163, 175-76 (Pa.2012).

Applying these principles here, Gutierrez's declarations were spontaneous reactions to a shocking event, were not in contemplation of prosecution, and were in response to ongoing police efforts to assist in response to an emergency call. When Officers Long and Battista arrived at the victims' home, they found Moody on the kitchen floor with blood on his hands and wearing no shoes. Gutierrez repeatedly stated that "the guy came into my house" and "broke my window." Gutierrez was "scared and

shaking", had a red face, and was sweating and breathing hard. The officers saw that the rear window of the home was broken and observed blood on the window sill. The officers found boots outside the home, one in the rear alleyway and another inside Moody's truck outside. The circumstances demonstrate that the officers were carrying out their security and public safety functions to protect the victims from possible harm. The purpose of Gutierrez's spontaneous explanation was to assist the police in responding to the emergency and assessing how many intruders were in the home. The informal, urgent nature of the encounter and the spontaneity of Gutierrez's utterances further compel the conclusion that his statements were nontestimonial. Accordingly, the trial court correctly determined that the admission of Gutierrez's utterances did not violate Moody's right of confrontation. ***See also Williams***, 103 A.3d at 361-63 (victim's statements in 911 call from neighbor's house informing operators that defendant, her ex-boyfriend, forced her to have intercourse, that he burned her by pouring gasoline and lighter fluid on her and igniting the mixture, that her row house was on fire, and that defendant ran out of house were made for the primary purpose of seeking medical assistance and assisting first responders in addressing an ongoing emergency, and therefore statements were not testimonial for confrontation clause purposes, even though defendant was not in victim's immediate presence during call, where victim made statements at a time when she was severely and mortally wounded with first

and second-degree burns over half of her body and frantically pleading for help, victim's breathing was labored, and victim repeatedly stated that she was going to pass out); ***Commonwealth v. Gray***, 867 A.2d 560, 577 (Pa.Super.2005) (spontaneous statements made to secure police assistance are not made subject to interrogation or in contemplation of prosecution and thus are nontestimonial).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/16/2015