J-S17023-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JEFFREY PALMER | |
| Appellant | No. 821 EDA 2016 |

Appeal from the Judgment of Sentence Entered January 28, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0002288-2015

BEFORE:  OLSON, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED MAY 17, 2017**

Appellant, Jeffrey Palmer, appeals from the January 28, 2016 judgment of sentence imposing life in prison without parole for first degree murder, and concurrent terms of ten to twenty years of incarceration for attempted murder, three to six years of incarceration for unlawful possession of a firearm, and one to two years of incarceration for possession of an instrument of crime.[1]  We affirm.

The trial court's opinion sets forth the pertinent facts:

> On July 19, 2014, residents of the 6000 block of North Beechwood Street held a block party.  At around 11 p.m., while the party was winding down, Malik Hairston heard several men yelling, 'where gray tank top at?'  Around the same, [sic] Octavious Thornton, also known as 'Ta,' wearing a gray tank top,

---

[1]  18 Pa.C.S.A. §§ 2502(a), 901, 6106, and 907, respectively.

was outside his mother's house at [the] 6088 block of North Beechwood Street. While Thornton was moving tables and chairs from the party into the house, a group of men approached. One of the men said, 'let me holler at you,' in which Thornton replied, 'I don't know you from a can of paint.' Another male in the group asked Thornton, 'What's up? What's up?' Then a man in a red polo shirt advised Thornton, 'It's just a yes or no question.' As Thornton walked away and made his way into the house, the group of men grabbed him from the porch steps, and began punching him. More men soon gathered, and up to ten or twelve men punched Thornton and pulled him into the street. Thornton placed his back against a car and covered his body with his arms to protect himself from the barrage of punches.

Thornton's mother, sister (Daria), and Hairston, attempted to intervene. After Hairston struck one man, and pulled him off Thornton, the group of men attacked Hairston. Hairston grabbed a rake and swung it at some of the attacking men. After Hairston swung the rake, a voice among the attacking men yelled, 'Shoot that n*gger.' Immediately thereafter, gunshots rang out. To avoid being shot, Hairston ran into the house at [the] 6088 block of North Beechwood through the front door. He was the only person who fled into the house. After firing the shots, the shooter jumped into a gray vehicle and drove off.

Thornton told police that the shooter had a revolver, and described him as a black male, dark skin, 25 years old, wearing a red polo shirt, approximately 5' 6" to 5' 8", with a stocky build. Thornton's sister Daria also stated that the shooter wore a red shirt. She further testified that no one else involved in the fight had a red shirt on. Following the shooting, both Thornton and Hairston identified [Appellant] from a photographic array as the male in the red polo shirt.

Almost immediately following the shooting, at or around 11:20 p.m., Police Officer James Butler saw a silver vehicle speeding southbound on Ogontz Avenue, about six to eight blocks from the shooting on Beechwood. Officer Butler and Officer Mark Austin attempted to pursue the vehicle, but lost sight of it.

Not long after Officer Butler first spotted the speeding vehicle on Ogontz Avenue, a security guard at Albert Einstein Hospital—just a few blocks from Ogontz Avenue—heard tires

screeching and witnessed a gray vehicle speeding up the hospital's emergency entrance. After the vehicle appeared to hit a guardrail, the passenger side window lowered, and the vehicle backed up and drove off. When a security guard inspected the guardrail for damage, he saw a gun lying nearby in the grass.

Roughly a minute after losing sight of the vehicle on Ogontz Avenue, Offices Butler and Austin responded to Einstein Hospital for a report of a gunshot victim, later identified as Thomas Fields, who had just arrived. Fields was pronounced dead at 11:40 p.m. The cause of death was a gunshot wound to the neck and the manner of death was homicide. A bullet entered the right side, upper back, near the neck. It traveled through the neck, striking the cervical spine, and perforated the right vertebral arteries, which provide blood to the brain. The bullet exited the front of the neck.

Upon their arrival at the hospital, Officers Butler and Austin noticed the same vehicle that they had just observed speeding on Ogontz parked in front of the ER. The passenger door was ajar, and a large amount of blood was on the vehicle's interior. The officers secured the vehicle, believing that it was a crime scene. Blood was subsequently found on the vehicle's seat, armrest, floor, door panel, and console. The front passenger side wheel was also flat.

Officer Austin then entered the hospital to locate the driver of the silver/gray vehicle. In the ER lobby, he found [Appellant] exiting the bathroom. There, [Appellant] informed the officer that an altercation took place at a cookout and someone there was shot. The police later took [Appellant] to the Homicide Unit for questioning.

On July 20, 2014, [Appellant] gave a statement to police, in which he told detectives that he was present when a shooting occurred at Beechwood. He said that he saw a fight break out at a block party and then heard gunshots. He also said that after the gunshots, Fields, his friend, said to him that he could not breath. [Appellant] stated that Fields had asthma. He claimed that after he and Fields got into his car to drive to the hospital, Fields coughed up blood.

Police later recovered a security video from Einstein Hospital. On the night of the shooting, at approximately 11:25:28, the camera captured [Appellant's] vehicle driving up

- 3 -

to the hospital's emergency room ramp. At 11:26:14, the video showed [Appellant's] vehicle, both doors open, pulling up outside the ER. [Appellant] existed [sic] the vehicle wearing a red polo shirt. Roughly thirty seconds later, [Appellant] removed the shirt, and threw it over a guardrail past where his vehicle was parked. A few minutes later, [Appellant] retrieved the shirt and tossed it into the trunk of the vehicle.

The police later recovered the gun that was lying near the hospital guardrail. The gun, a revolver, held two fired cartridge casing ("FCCs") and three live rounds—all of which were .38 caliber and of the same manufacture. A total of four ballistic pieces were recovered from the shooting scene at 6088 North Beechwood Street, including two copper fragments found on the property, a lead fragment in the outside wall near the doorframe, and a projectile in the front door, five inches south of the doorknob. Officer Raymond Andrejczak, of the Police Firearms Identification Unit, concluded to a reasonable degree of scientific certainty that both copper fragments, the projectile, and both FCCs in the gun were all fired in and from the subject revolver. The remaining piece (the lead fragment) was unsuitable for microscopic comparison, but was consistent with a 9 millimeter/.38 caliber projectile. The subject revolver was incapable of firing a 9 millimeter bullet.

Trial Court Opinion, 4/18/16, at 2-5 (record citations omitted).

On August 4, 2014, police arrested Appellant for the murder of Fields. After a January 28, 2016 trial, a jury found Appellant guilty of the aforementioned offenses. The trial court imposed sentence immediately. On January 29, 2016, Appellant filed a post-sentence motion challenging the weight and sufficiency of the evidence. The trial court denied that motion on February 11, 2016. This timely appeal followed. Appellant presents three questions for our review:

> I.    Did the trial court err, abuse its discretion, and unfairly prejudice [Appellant] when the court overruled an

objection and allowed the prosecutor to vouch for witnesses during closing argument?

II. Was the evidence sufficient as a matter of law to convict [Appellant] of murder of the first degree?

III. Was the verdict against the weight of the evidence?

Appellant's Brief at 5.

Appellant first asserts that the trial court erred in overruling his objection to the prosecutor's alleged misconduct. Appellant argues that the prosecutor improperly vouched for the credibility of the investigating police officers.

> It is well established that the prosecution may not inject a highly prejudicial personal opinion of [an] appellant's credibility into evidence, thereby clearly and improperly intruding upon the jury's exclusive function of evaluating the credibility of witnesses. However, as long as a prosecutor does not assert his personal opinions, he or she may, within reasonable limits, comment on the credibility of a Commonwealth witness. This is especially true when the credibility of the witness has been previously attacked by the defense. This stems from the general principle that the prosecutor is permitted to respond to the arguments of the defense and is free to present his or her case with logical force and vigor.

*Commonwealth v. Tedford*, 960 A.2d 1, 31–32 (Pa. 2008).

Several witnesses who gave contemporaneous statements to the police testified at trial that the police coerced or fabricated their statements. During closing argument, defense counsel attacked the credibility of the testifying police officers. The prosecutor, during his closing argument, responded with sarcasm, saying that the alleged fabrications did not significantly advance the prosecution's case. The prosecutor also opined

that officers with a combined 150 years of experience are unlikely to fabricate evidence. The prosecutor did not offer a personal opinion as to any witnesses' credibility. For the reasons explained on pages 5 to 8 of the trial court's April 18, 2016 opinion, we conclude that Appellant's argument lacks merit.

Next, Appellant challenges the weight and sufficiency of the evidence. As the trial court correctly noted, Appellant's Pa.R.A.P. 1925(b) statement contains only bald assertions that his convictions are against the weight and sufficiency of the evidence. Bald assertions are insufficient to preserve the issue for review. *Commonwealth v. Reeves*, 907 A.2d 1, 2 (Pa. Super. 2006), *appeal denied*, 919 A.2d 956 (Pa. 2007). For the reasons explained in the trial court's opinion, Appellant has waived his challenges to the weight and sufficiency of the evidence.

In summary, we have concluded that Appellant's first argument lacks merit, and the second and third arguments are waived. We therefore affirm the judgment of sentence. We direct that a copy of the trial court's opinion be filed along with this memorandum.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/2017

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA       : CP-51-CR-0002288-2015

v.

JEFFREY PALMER

**FILED**

APR 1 8 2016

Criminal Appeals Unit
First Judicial District of PA

OPINION

McDermott, J.                                                          April 18, 2016

## Procedural History

On August 4, 2014, the Defendant, Jeffrey Palmer, was arrested and charged with Murder, Conspiracy, Attempted Murder, Aggravated Assault, Possession of Firearm Prohibited, Firearms Not to be Carried Without License, Carrying Firearms in Public in Philadelphia, and Possession of an Instrument of Crime ("PIC"). On January 25, 2016, the Defendant appeared before this Court and elected to be tried by a jury. On January 28, 2016, the jury returned verdicts of guilty to First-Degree Murder, Attempted Murder, Aggravated Assault, Firearms Not to be Carried Without License, and PIC.

On that same date, this Court imposed a term of imprisonment of life without the possibility of parole for First-Degree Murder, and concurrent terms of ten to twenty years for attempted murder,[1] three to six years for Firearms Not to be Carried Without License, one to two years for PIC.

On January 29, 2016, the Defendant filed a post-sentence motion challenging the weight and sufficiency of the evidence. On February 11, 2016, this Court denied the motion. On

---

[1] Attempted Murder and Aggravated Assault merged.

February 17, 2016, the Defendant filed a timely Notice of Appeal. On February 23, 2016, this Court ordered the Defendant to submit a Statement of Matters Complained of on Appeal pursuant Pa.R.A.P. 1925(b). On March 10, 2015, the Defendant filed a Motion for Extension of Time to file a Statement of Matters Complained of, which this Court granted on March 14. On April 4, 2016, the Defendant timely filed a Concise Statement of Matters Complained of on Appeal.

## Facts

On July 19, 2014, residents of the 6000 block of North Beechwood Street held a block party. At around 11 p.m., while the party was winding down, Malik Hairston heard several men yelling, "where gray tank top at?" Around the same, Octavious Thornton, also known as "Ta," wearing a gray tank top, was outside his mother's house at 6088 block of North Beechwood Street. While Thornton was moving tables and chairs from the party into the house, a group of men approached. One of the men said, "let me holler at you," in which Thornton replied, "I don't know you from a can of paint." Another male in the group asked Thornton, "What's up? What's up?" Then a man in a red polo shirt advised Thornton, "It's just a yes or no question." As Thornton walked away and made his way into the house, the group of men grabbed him from the porch steps, and began punching him. More men soon gathered, and up to ten or twelve men punched Thornton and pulled him into the street. Thornton placed his back against a car and covered his body with his arms to protect himself from the barrage of punches. N.T. 1/25/2016 at 95–99; N.T. 1/26/2016 at 85–86, 102.

Thornton's mother, sister (Daria), and Hairston, attempted to intervene. After Hairston struck one man, and pulled him off Thornton, the group of men attacked Hairston. Hairston grabbed a rake and swung it at some of the attacking men. After Hairston swung the rake, a

2

voice among the attacking men yelled, "Shoot that n*gger." Immediately thereafter, gunshots rang out. To avoid being shot, Hairston ran into the house at 6088 block of North Beechwood through the front door. He was the only person who fled into the house. After firing the shots, the shooter jumped into a gray vehicle and drove off. N.T. 1/25/2016 at 100–05, 115–17; N.T. 1/26/2016 at 92–95, 127, 180–85.

Thornton told police that the shooter had a revolver, and described him as a black male, dark skin, 25 years old, wearing a red polo shirt, approximately 5'6" to 5'8", with a stocky build. Thornton's sister Daria also stated that the shooter wore a red shirt. She further testified that no one else involved in the fight had a red shirt on. Following the shooting, both Thornton and Hairston identified the Defendant from a photographic array as the male in the red polo shirt. N.T. 1/25/2016 at 117–19; N.T. 1/26/2016 at 103, 182.

Almost immediately following the shooting, at or around 11:20 p.m., Police Officer James Butler saw a silver vehicle speeding southbound on Ogontz Avenue, about six to eight blocks from the shooting on Beechwood. Officer Butler and Officer Mark Austin attempted to pursue the vehicle, but lost sight of it. N.T. 1/26/2016 at 26–33, 307–09.

Not long after Officer Butler first spotted the speeding vehicle on Ogontz Avenue, a security guard at Albert Einstein Hospital—just a few blocks from Ogontz Avenue—heard tires screeching and witnessed a gray vehicle speeding up the hospital's emergency entrance. After the vehicle appeared to hit a guardrail, the passenger side window lowered, and the vehicle backed up and drove off. When the security guard inspected the guardrail for damage, he saw a gun lying nearby in the grass. N.T. 1/26/2016 at 60–68.

Roughly a minute after losing sight of the vehicle on Ogontz Avenue, Officers Butler and Austin responded to Einstein Hospital for a report of a gunshot victim, later identified as Thomas

Fields, who had just arrived. Fields was pronounced dead at 11:40 p.m. The cause of death was a gunshot wound to the neck and the manner of death was homicide. A bullet entered the right side, upper back, near the neck. It traveled through the neck, striking the cervical spine, and perforated the right vertebral arteries, which provide blood to the brain. The bullet exited the front of the neck. N.T. 1/26/2016 at 26–27, 307–09; N.T. 1/27/2016 at 83–85.

Upon their arrival at the hospital, Officers Butler and Austin noticed the same vehicle that they had just observed speeding on Ogontz parked in front of the ER. The passenger door was ajar, and a large amount of blood was on the vehicle's interior. The officers secured the vehicle, believing that it was a crime scene. Blood was subsequently found on the vehicle's seat, armrest, floor, door panel, and console. The front passenger side wheel was also flat. N.T. 1/26/2016 at 29–33, 295–96, 307–09; N.T. 1/27/2016 at 29, 32.

Officer Austin then entered the hospital to locate the driver of the silver/gray vehicle. In the ER lobby, he found the Defendant exiting the bathroom. There, the Defendant informed the officer that an altercation took place at a cookout and someone there was shot. The police later took the Defendant to the Homicide Unit for questioning. N.T. 1/26/2016 at 309–11.

On July 20, 2014, the Defendant gave a statement to police, in which he told detectives that he was present when a shooting occurred at Beechwood. He said that he saw a fight break out at a block party and then heard gunshots. He also said that after the gunshots, Fields, his friend, said to him that he could not breathe. The Defendant stated that Fields had asthma. He claimed that after he and Fields got into his car to drive to the hospital, Fields coughed up blood. *Id.* at 174–91.

Police later recovered a security video from Einstein Hospital. On the night of the shooting, at approximately 11:25:28, the camera captured the Defendant's vehicle driving up to

4

the hospital's emergency room ramp. At 11:26:14, the video showed the Defendant's vehicle, both doors open, pulling up outside the ER. The Defendant existed the vehicle wearing a red polo shirt. Roughly thirty seconds later, the Defendant removed the shirt, and threw it over a guardrail past where his vehicle was parked. A few minutes later, the Defendant retrieved the shirt and tossed it onto the trunk of his vehicle. N.T. 1/27/2016 at 201–11, 242–43.[2]

The police later recovered the gun that was lying near the hospital guardrail. The gun, a revolver, held two fired cartridge casing ("FCCs") and three live rounds—all of which were .38 caliber and of the same manufacture. A total of four ballistic pieces were recovered from the shooting scene at 6088 North Beechwood Street, including two copper fragments found on the property, a lead fragment in the outside wall near the doorframe, and a projectile in the front door, five inches south of the doorknob. Officer Raymond Andrejczak, of the Police Firearms Identification Unit, concluded to a reasonable degree of scientific certainty that both copper fragments, the projectile, and both FCCs in the gun were all fired in and from the subject revolver. The remaining piece (the lead fragment) was unsuitable for microscopic comparison, but was consistent with a 9 millimeter/.38 caliber projectile. The subject revolver was incapable of firing a 9 millimeter bullet. N.T. 1/25/2016 at 84; N.T. 1/26/2016 at 182, 263–70.

Discussion

The Defendant alleges that this Court erred when it overruled the Defendant's objection and permitted the prosecutor to vouch for detectives and police officers. The Defendant also

---

[2] A mixture of DNA was taken from the back collar of the red polo shirt. Benjamin Levin, a forensic scientist, testified to a reasonable degree of scientific certainty that the major component taken from the back collar was consistent with a mixture originating from at least two contributors, one of which had a high probability of being Jeffrey Palmer. N.T. 1/27/2016 at 59–63.

5

makes weight and sufficiency claims for First-Degree Murder, Attempted Murder, Aggravated Assault, Firearms Not to be Carried Without License, and PIC.

For the Defendant's first issue, during closing remarks, in response to insinuations that the detectives coerced witnesses, the Commonwealth referenced the detectives who had testified at trial. In his remarks, the Commonwealth reiterating the detectives' law enforcement experience and sarcastically chastised them for not "fixing" the case better:

> COMMONWEALTH: Every insinuation has been made that Detective Harkins, Detective Fetters[,] who is here, that they what? That they forced people to say things; that they put things in the statement. Presumably to do what, right? To make their case better, right? To get the prosecution's conviction because it means so much to me. Every prosecution does because he means so much to them, to the Fields family, and every other family.
>
> But that's insinuation, right, that the detectives forced them, to say things to make the case better. Well, you heard me ask each of the detectives, ["]How long have you been on force? How long were you in homicide? To get promoted to homicide, where were you?["] I wasn't doing that for fluff. I was doing that so you could hear how long they were on the force. Why? Because they're not rookies. Thirty years, 26 years, 27 years; among them, over 150 years of experience. So, okay, they're going to fabricate, right[?] Detective Harkins is going to make Malik [Hairston] say what he wants him to say, make the case better.
>
> Okay. Well, when you have Malik in there, right, and you want to frame I suppose the [D]efendant, here's what was forced upon Malik Hairston. This is what was forced upon him, right? He didn't want to say it, it was forced.
>
> . . .
>
> Well, if this is what's happening, that they're and forcing cases. Detective Harkins, next time you're going to force someone to do something, please force them to identify the defendant as actually shooting. Because this doesn't do anything for me. Force them to say he's the shooter. That's what's going to help me, right, not this nonsense. They're [referring to the detectives] fixing the case? Make it better.

N.T. 1/28/2016 at 86. Following closing arguments, defense counsel objected to the remarks and argued that the Commonwealth was "vouchsafing" and "vouching" for the detectives. Defense

6

counsel requested a curative instruction to instruct the jury not to give greater weight to the witnesses because they are detectives, which this Court denied.

It is well-established that a prosecutor is free to present his argument with logical force and vigor so long as there is a reasonable basis in the record for the prosecutor's remarks. *Commonwealth v. Hutchinson*, 25 A.3d 277, 306 (Pa. 2011). Reversible error arises from a prosecutor's comments only where their unavoidable effect is to prejudice the jurors, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict. *Commonwealth v. Tedford*, 960 A.2d 1, 33 (Pa. 2008). The prejudicial effect of the prosecutor's remarks must be evaluated in the context in which they occurred. *Commonwealth v. Gooding*, 649 A.2d 722, 727 (Pa. Super. 1994) (*citing Commonwealth v. D'Amato*, 526 A.2d 300, 309 (Pa. 1987) (citations omitted)). The effect of remarks made in closing arguments is to be ascertained by the trial judge. *Commonwealth v. Williams*, 433 A.2d 505 (Pa. Super. 1981) (*citing Commonwealth v. Stoltzfus*, 337 A.2d 873, 882 (Pa. 1975)). The remedy to be applied in each case is within the discretion of the trial judge. *Stolfus*, 337 A.2d at 882; *Commonwealth v. Silvis*, 284 A.2d 740, 741 (Pa. 1971).

The prosecutor's remarks and his use of sarcasm to appeal to the commonsense of the jury were well within the permissible bounds. Additionally, before closing arguments, this Court properly instructed the jury that they were not bound by the attorneys' recollection of the evidence nor their conclusions of the facts, and that it was for the jury to decide what arguments, if any, appeal to their reason and commonsense. N.T. 1/28/2016 at 21–22. Moreover, at the start of trial, and in its final charge, this Court instructed the jury that they were the judges of a witness's credibility. N.T. 1/25/2016 at 18. The jury is presumed to follow these instructions.

7

*Commonwealth v. Jones*, 668 A.2d 491, 503-04 (Pa. 1995). For the foregoing reasons, the Defendant is not entitled to relief.

For the Defendant's next issue, he baldly asserts that the evidence for each of his convictions was insufficient. This Court finds the Defendant's 1925(b) Statement deficient as he neglects to specify how the evidence failed to establish which elements of each offense. As Superior Court has held, "[i]f Appellant wants to preserve a claim that the evidence was insufficient, then the 1925(b) Statement needs to specify the element or elements upon which the evidence was insufficient." *Commonwealth v. Manley*, 985 A.2d 256 (Pa. Super. 2009) (*quoting Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008)); *Commonwealth v. Reeves*, 907 A.2d 1 (Pa. Super. 2006), *appeal denied*, 919 A.2d 956 (Pa. 2007). For this reason, the sufficiency issues are deemed waived. For the benefit of any future proceedings, however, this Court will address the sufficiency of the evidence for each of the Defendant's convictions.

Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may sustain its burden of proving each element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011) (*citing Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa. Super. 2010)). The fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder. *Commonwealth v. Treiber*, 874 A.2d 26, 30 (Pa. 2005). The Superior Court considers all the evidence admitted, without regard to any claim of wrongly admitted

evidence. *Commonwealth v. Kane*, 10 A.3d 327, 332 (Pa. Super. 2010). The Superior Court will also not weigh the evidence or make credibility determinations. *Id.*

First-Degree Murder is any unlawful killing committed with malice and the specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Johnson*, 42 A.3d 1017, 1025 (Pa. 2012). The specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Thomas*, 54 A.3d 332, 335–36 (Pa. 2012); *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011) (*citing Commonwealth v. Smith*, 985 A.2d 886, 895 (Pa. 2009)). Evidence is sufficient to sustain a conviction for First-Degree Murder when the Commonwealth establishes that: (1) a human being was unlawfully killed; (2) the accused is responsible for the killing; and (3) the accused acted with specific intent. 18 Pa.C.S. § 2502(a); *Commonwealth v. Chambers*, 980 A.2d 35, 44 (Pa. 2009). The Commonwealth may establish that a defendant intentionally killed the victim wholly through circumstantial evidence. *Id.* (*citing Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001)).

Under the doctrine of transferred intent, the intent to murder may be transferred where the person actually killed is not the intended victim. *See Commonwealth v. Jones*, 912 A.2d 268 (Pa. 2006) (finding that appellant had specific intent to kill a bystander, who was not the specific target, where appellant shot others three or four times at close range and killed the bystander with a single gunshot wound to the chest). The theory behind the doctrine is that if the intent to commit a crime exists, this intent can be transferred for the purpose of finding the intent element of another crime. *Commonwealth v. Thompson*, 739 A.2d 1023, 1030 (Pa. 1999) (*citing Commonwealth v. Gibbs*, 626 A.2d 133 (Pa. 1993)).

In the case at bar, sufficient evidence established that the Defendant, with the specific intent to kill, murdered Thomas Fields. The cause of death was a gunshot wound to Fields' neck.

9

N.T. 1/27/2016 at 83–85. Thornton identified the Defendant as the shooter. N.T. 1/25/2016 at 117–18. Thornton's sister Daria stated that the shooter wore a red polo shirt and both Hairston and Thornton identified the Defendant as the person in the red polo shirt. N.T. 1/25/2016 at 119; N.T. 1/26/2016 at 103, 182. The Defendant was the only person present in the fight wearing a red shirt, which he still had on when he arrived at the ER with Fields. N.T. 1/26/2016 at 182; N.T. 1/27/2016 at 201–11. In addition, the police found a revolver on the hospital grounds near where the Defendant appeared to strike a guardrail and lowered his window. N.T. 1/26/2016 at 60–68. Both copper fragments and the projectile, found at Beechwood, were fired from the found revolver. *Id.* at 182, 265–69.

In addition to the evidence establishing the Defendant as the shooter, the evidence also showed that the Defendant specifically intended to shoot Hairston, and not in self-defense, as the Defendant was part of the group of men that was not free from fault in provoking or continuing the difficulty which resulted in the fight and subsequent shooting. *See Commonwealth v. Mouzon*, 53 A.3d 738 (Pa. 2012). Because the Defendant shot at Hairston after a voice among the attacking men yelled, "Shoot that n*gger," coupled with the fact that police found a bullet fragment near the door frame and a projectile in the door of 6088 North Beechwood, indicated that the Defendant specifically aimed at Hairston as Hairston fled into the house. N.T. 1/25/2016 at 84; N.T. 1/26/2016 at 92, 180–85. Hairston was the only participant in the fight to run into the house. N.T. 1/26/2016 at 127. That the Defendant's intended target was Hairston, and not Fields, is of no moment, as the Defendant's intent to kill Hairston was transferred to Fields. *See Jones* and *Thompson, supra.*

The Defendant challenges the sufficiency of the evidence for his convictions for attempted murder and aggravated assault. A person is guilty of attempted murder if he takes "a

10

substantial step towards an intentional killing." *Commonwealth v. Wesley*, 860 A.2d 585, 593 (Pa. Super. 2004); *see also* 18 Pa.C.S.A. § 901(a). If a defendant takes a "substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder." *In re R.D.*, 44 A.3d 657, 678 (Pa. Super. 2012). The "substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *Id.* (*quoting Commonwealth v. Gilliam*, 417 A.2d 1203, 1205 (Pa. Super. 1980)). The Commonwealth may also solely use circumstantial evidence to establish the *mens rea* required for first-degree murder—the specific intent to kill. *In re R.D.*, 44 A.3d at 678 (*citing Commonwealth v. Schoff*, 911 A.2d 147, 160 (Pa.Super.2006)).

To sustain a conviction for aggravated assault, the Commonwealth must prove that the Defendant either attempted if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1); *Commonwealth v. Matthew*, 909 A.2d 1254, 1257 (Pa. 2006). "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Commonwealth v. Lewis*, 911 A.2d 558, 564 (Pa. Super. 2006); 18 Pa.C.S. § 2301. For aggravated assault purposes, an attempt is found where the accused, with the required specific intent, acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another. *Commonwealth v. Matthews*, 870 A.2d 924, 929 (Pa. Super. 2005) (citation omitted).

In the instant matter, the Defendant's actions clearly constituted attempted murder. The Defendant aimed a gun and fired at Hairston after someone requested him to do so—this clearly

established that he took a substantial step toward an intentional killing and demonstrated that he had the requisite intent to shoot and kill Hairston. N.T. 1/26/2016 at 92, 180–85. The same evidence also sufficiently demonstrated aggravated assault as the Defendant's act of aiming a gun and firing at Hairston constituted a substantial step toward perpetrating a serious bodily injury upon another.

The Defendant also challenges his convictions for Carrying a Firearm in Public Without a License and PIC. To convict a defendant of Carrying a Firearm in Public Without a License, the Commonwealth must prove: "(a) that the weapon was a firearm, (b) that the firearm was unlicensed, and (c) that where the firearm was concealed on or about the person, it was outside his home or place of business." *Commonwealth v. Parker*, 847 A.2d 745, 750 (Pa. Super. 2004); *see also* 18. Pa. C.S.A. § 6106.

To secure a conviction for PIC, the Commonwealth must show that a defendant possessed an instrument of crime with the intent to employ it criminally. 18 Pa.C.S. § 907(a). An instrument of crime is "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. § 907(d)(2); *see also Commonwealth v. Robertson*, 874 A.2d 1200, 1208–09 (Pa. Super. 2005).

This evidence was more than sufficient to establish the Defendant carried a firearm in public without a license. Thornton told police that he saw the Defendant with a gun fire at Hairston. 1/25/2016 at 117–18. The security officer at the Einstein Hospital testified that a vehicle—matching the description of the Defendant's vehicle—stopped and lowered its window in the same area where the gun used in the shooting was found. N.T. 1/26/2016 at 60–68. Both copper fragments and the projectile recovered from Beechwood were fired from the subject revolver. *Id.* at 182, 265–69. The certificate of non-licensure submitted by the Commonwealth

12

conclusively established that the Defendant was not eligible to carry a firearm at the time of the shooting. N.T. 1/27/2016 at 251–52. As the above discussion for first-degree murder indicated, there was also more than sufficient evidence to establish that the Defendant's possessed a criminal instrument with the intent to employ it criminally. Thus, these two claims are devoid of merit.

Finally, the Defendant alleges that the verdicts for all convictions were against the weight of the evidence. Because the Defendant, again, makes a bald assertion, this Court finds his 1925(b) Statement deficient. A Rule 1925(b) statement that is not specific enough for the trial court to identify and address the issues an appellant wishes to raise may also result in waiver. *Reeves*, 907 A.2d at 1; *see also Commonwealth v. Seibert*, 799 A.2d 54, 62 (Pa. Super. 2002) (finding that the weight of evidence claim was waived where the Rule 1925(b) statement only asserted that the jury verdict "was against the weight of the credible evidence as to all of the charges"). For the benefit of any future proceedings, however, this Court will address the weight of the evidence claims.

Weight of the evidence and sufficiency of the evidence are discrete inquiries. An argument that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict, but contends that the verdict is against the weight of the evidence. *Commonwealth v. Davis*, 799 A.2d 860, 865 (Pa. Super. 2002). An allegation that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial court. *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa. Super. 2005) (*citing Commonwealth v. Sullivan*, 820 A.2d 795, 805–06 (Pa. Super. 2003)).

For a weight of the evidence claim to succeed, the test is whether the verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Diggs*, 949 A.2d

13

873, 879–80 (Pa. 2008). To determine whether this standard is met, appellate review is "limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Id.* Hence, this Court's denial of a motion for a new trial based on a weight of the evidence claim "is the least assailable of its rulings." *Id.* at 880.

As the fact-finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, for a defendant to prevail on a challenge to the weight, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Sullivan,* 820 A.2d at 806. This is a lofty standard as generally this threshold is only met when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his [or her] breath, temporarily, and causes him [or her] to almost fall from the bench; [only] then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson,* 860 A.2d 575, 582 (Pa. Super. 2004) (*quoting Nudelman v. Gilbride,* 647 A.2d 233, 237 (Pa. 1994)).

The Defendant's weight of the evidence claims for first-degree murder, attempted murder, and aggravated assault are without merit as the verdicts were consistent with the evidence and a far cry from shocking one's sense of justice. The Commonwealth presented a considerable amount of testimonial, physical, and scientific evidence that the Defendant, with the specific intent, fired at Hairston and struck and killed Fields. The jury's verdict indicates that they chose to credit this evidence rather than the Defendant's theory of the case.

Having concluded that the weight of the evidence supports first-degree murder, attempted murder, and aggravated assault, this Court also finds that the weight of the evidence supports the verdict for PIC and Carrying a Firearm in Public Without a License. The evidence, as discussed

14

above, clearly shows that the Defendant intended to criminally employ a firearm when he shot at Hairston and struck and killed Fields. The record also reflects that the Defendant was not eligible to carry a firearm at the time of the shooting. These claims are, therefore, meritless.

For the foregoing reasons, Defendant's claims are DENIED.

BY THE COURT,

Barbara A. McDermott, J

*Commonwealth v. Jeffrey Palmer*
CP-51-CR-0002288-2015

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing filing upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa. R. Crim. P. 114:

Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
Attn: Gaetano D'Andrea, Esq.

Type of Service:          **Hand Delivery**

Nino Tinari, Esq.
1528 Walnut Street
Suite 1212
Philadelphia, PA 19107

Type of Service:          **First-Class Mail**

Jeffrey Palmer
MJ6344
SCI Camp Hill
P.O. Box 200
Camp Hill, PA 17001

Type of Service:          Certified Mail

Dated: April 18, 2016

R. Christopher Campbell, Esq.
Judicial Clerk to the
Honorable Barbara A. McDermott